**Lloyd K. CLARK and Robert L. White, d/b/a Engineering Science of Alaska, a General Partnership, Appellants,**

v.

**CITY OF SEWARD, a Municipal Corporation, Appellee.**

No. 5457.

Supreme Court of Alaska.

Feb. 25, 1983.

Thomas J. Yerbich, Wadsworth, Stanley & Yerbich, Anchorage, for appellants.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellee.

Before RABINOWITZ, C.J., CONNOR, BURKE, MATTHEWS and COMPTON, JJ.

OPINION

MATTHEWS, Justice.

In February of 1971 appellant, Engineering Science of Alaska (ESAL) contracted

with appellee, the City of Seward, to perform engineering services as required for the design and construction of a sewage treatment plant and for the extension of the City's water and sewer systems to a new subdivision. The contract called for ESAL to prepare a preliminary engineering report for review by an agency of the federal government and by the City. After such review, the City could then direct ESAL to prepare a detailed design of the project, but the City was under no obligation to do so until it was satisfied "that funds are then or will be available within one year, in an amount sufficient to pay the entire project costs."

The preliminary engineering report was completed before July 30, 1971. A modified report was authorized by the City on April 6, 1972, to deal with industrial water flows. This was submitted to the City in November of 1972.

On July 25, 1973, the City directed ESAL "to proceed with the preliminary and final design of the project." In August of 1973 the City was advised that the Environmental Protection Agency (EPA) had recently promulgated a requirement that a study be made of any existing sewer system as a condition to the allocation of grant funds for sewage treatment plants. The study had two parts. First, an infiltration and inflow analysis was to be conducted to determine if too much clear water was entering the system. Secondly, if it was determined that there was a problem in this respect, a report evaluating the cost and effectiveness of various means of dealing with the problem was required.

A first phase draft report was completed in October of 1973 and forwarded to the City, EPA, and the Economic Development Administration (EDA). It concluded that a serious excess inflow problem existed during the winter. This was caused by water users leaving faucets on to prevent freezing, a practice necessitated by the fact that a large number of the water lines in the City were too shallow. The excessive flow of clean water in the system would require, according to the report, a treatment plant

larger than would otherwise be needed, and resulted in high water system pumping costs. Further, the report questioned whether the dilute waste could be effectively treated with a conventional biological system and suggested that a more complex and expensive method of treatment might be required.

The draft report outlined a corrective action program including excavating and lowering shallow water lines or, where feasible, insulating or installing heat tapes on them, installing water meters to discourage water wastage, and passing City codes to insure proper installation of new lines. The report also recommended that the corrective action program be declared eligible for a grant to the extent of 87½% of its cost and concluded that the second phase of the required study proceed to establish detailed corrective recommendations and costs, and treatment plant design.

On October 27, 1973 a representative of the EDA wrote the City asking whether it had any objection to using meters in order to conserve water. The City Manager's response, given on November 12, 1973, was that while the City did not object to water meters *per se*, "such an installation for individual residential services would create problems in installation, servicing and would also result in reduced flows with increased incidents of freezing. This would be detrimental to the system and would cost thousands of dollars to maintain and repair." The City Manager suggested as a counter proposal metering commercial accounts only as "one which may fare better before the City Council."

On November 27, 1973, the City Manager reported by letter to ESAL that the City Council had reviewed the infiltration and inflow analysis, and "have no adverse comments to make regarding it other than to point out a few of the many problems which apparently will be encountered in trying to install meters for residential and commercial use in Seward." The problems included the high cost of metering, the need to dig out most of the service lines and mains in the City in order to either lower

them, or insulate them and install antifreezing devices, and the extensive disruption and repaving that this would entail. The City's letter concluded:

> If you will incorporate these problems as an addition to the report we have no objection to its being transmitted to the EPA or the State of Alaska for their review.

ESAL responded on December 6, 1973 that the draft phase I infiltration/inflow analysis had already been transmitted to EPA and the State and that copies of the city's letter would be forwarded to them. ESAL noted that "the specific problems identified ... are those which would be evaluated by the phase II survey work as proposed...."

On December 10, 1973, the EDA notified the City that the installation of water meters, apparently throughout the City, would be required as a condition of a grant for the water system expansion. In March of 1974 the EDA formally offered a grant with this condition.

The EDA letter of December 10 requiring water meters caused the City Council to hold a public hearing on the matter on January 28, 1974. The hearing was well attended, and most citizens who testified were strongly against the installation of residential water meters.

ESAL wrote the City on February 19, 1974, advising it that the second phase of the EPA-required study had not yet taken place and that if the study showed that rehabilitation of the water system was not cost effective, EPA would fund a sewage treatment plant adequate to process the unrehabilitated system, while if cost effectiveness was shown EPA would fund the rehabilitation costs as well as the treatment system. ESAL, however, was never given the authority to proceed with the second phase of the study and on April 24, 1974 the City terminated its services. The cause for termination was, as expressed by the City Manager at trial, "the fact that they did not resolve the [water meter] question."

The City then hired another engineer who represented them in their dealings with the various governmental agencies involved. After a delay of more than a year the City was able to obtain grants for the water and sewer system expansions and for a sewage treatment plant which required commercial, but not residential water meters, and did not require that existing water lines be lowered or otherwise protected from freezing. The projects were bid in 1976, and subsequently constructed. The residents of Seward still leave their faucets on to keep their pipes from freezing, and freezing problems persist due to shallow water lines.

ESAL filed suit against the City to recover fees for services performed of $47,620.00 and lost profits of $20,392.00. The City answered denying liability, and counterclaimed for additional costs caused by ESAL in an amount in excess of $200,000.00.

At the trial the City claimed that the projects had been delayed for two years, from 1974 to 1976, due to ESAL's negligence. This, it claimed, caused an increase in costs of some $207,000.00. In addition, it claimed damages of $79,000.00 for substitute engineering services in excess of those it would have incurred had ESAL performed its contract.

The jury returned a verdict allowing ESAL $31,365.00 on its claim and awarding the City $234,966.21 on its counterclaim. ESAL moved for judgment N.O.V., and, in the alternative, for a new trial. The motion was denied.

On appeal ESAL claims that the court erred in failing to grant its motion for judgment N.O.V. or for a new trial, in admitting certain evidence relating to apparent deficiencies in ESAL's uncompleted plans, and in awarding attorney's fees to the City.

*Judgment N.O.V.*

■ ESAL did not move for a directed verdict at the close of the evidence. Such action is, by the express terms of Civil Rule 50(b), required as a condition of a motion

for judgment N.O.V.[1] We therefore hold that the superior court's denial of ESAL's motion for judgment N.O.V. must be affirmed. *Metcalf v. Wilbur Inc.,* 645 P.2d 163, 169–70 (Alaska 1982).

### New Trial Motion

"The matter of granting or refusing a new trial rests in the sound discretion of the trial judge." If there was an evidentiary basis for the jury's decision, the denial of a new trial must be affirmed. On the other hand, where "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust," a reversal of a denial of a new trial is proper. Finally, in reviewing the denial of a motion for a new trial, we must view the evidence in the light most favorable to the non-moving party.

*Bailey v. Lenord,* 625 P.2d 849, 856 (Alaska 1981) (citations, footnote omitted).

■ The court instructed the jury as follows with respect to the standard of care owed by an engineer to his client:

In performing professional services for a client, an engineer has the duty to have that degree of learning and skill ordinarily possessed by reputable engineers, practicing in the same or a similar locality and under similar circumstances.

It is his further duty to use the care and skill ordinarily used in like cases by reputable members of his profession practicing in the same or a similar locality under similar circumstances, and to use reasonable diligence and his best judgment in the exercise of his professional skill and in the application of his learning, in an effort to accomplish the purpose for which he was employed.

Instruction No. 33.

With respect to ESAL's conduct concerning the EPA mandated sewer system analysis there is no evidence in the record that ESAL failed to meet the standard expressed in this instruction. The evidence which comes closest is that of the City's subsequently employed engineer, Sidney Clark, who testified to the effect that if he, rather than ESAL, had been representing the City from the outset, he believed that EDA would not have initially insisted on residential water meters.[2] This testimony, in our view, falls short of supporting a conclusion that ESAL did not use appropriate professional care in acting as it did to recommend the examination of a comprehensive solution to Seward's water and sewer problems.

There is evidence that the unfinished design drawings of ESAL which were taken over by Clark did contain certain errors and

1. Civil Rule 50(b), governing motions for judgment N.O.V., provides, in part:

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after the entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict.

2. Mr. Clark's testimony on this point is as follows:

Q. Do you believe that there was any delay in your expert opinion? And then if the answer is yes what the delay was.

. . . .

A. I believe if I had had the opportunity to present the evidence to both agencies after it had been clearly understood by the City and the alternatives including water meters where required, had been properly presented, I do not believe that the requirement of EDA would have read residential water meters at any time. I believe the—the requirement would have read an ordinance for deeper mains, an ordinance for better construction of—of service connections, an ordinance for water meters on the industrial and commercial users because that's what they accepted from me.

Q. There would have been no requirements for residential users?

A. There would have been no requirements for residential users. There is no requirement except for new users and they are not metered. It's just a depth requirement.

Tr. 353–55.

omissions. However, there is no evidence that these shortcomings contributed to the two year delay on which the $207,000.00 claim was based. Likewise, the city's contract substituted services claim of $79,-000.00 does not itself support the $207,-000.00 delay claim.

The City has suggested that the bulk of its damage claim is supported by ESAL's "episodic pattern" of performance from the outset of this contract in 1971. However, there was no testimony that ESAL did not meet the standard of professional care in proceeding from the outset as it did. At trial the City Manager was asked by counsel for the City whether ESAL's delays were unreasonable; instead of giving an affirmative answer to that question, he stated that "what was unreasonable was the deaf ear ... that was happening at the end," relative to the controversy regarding water meters.[3]

In conclusion it is our view that evidence supporting that portion of the verdict in favor of the City in excess of $79,000.00 is completely lacking. Since it does not appear that the issues pertaining to the counterclaim are distinct and separable, a new trial on the entire counterclaim is required.[4]

REVERSED AND REMANDED.

RABINOWITZ, Chief Justice, concurring.

I agree with the majority that a new trial on the City of Seward's counterclaim is required; unlike the majority, however, I would conclude that there is no evidentiary basis for the $79,000 in damages claimed by the City for the cost of hiring a second engineering firm to complete the work begun by ESAL.

I agree with the majority's conclusion that ESAL could be held liable for negligence or breach of contract if it had produced substandard work and that the City's damages could include the additional costs incurred to hire a second engineering firm to do acceptable work. In my view, however, the City has failed to demonstrate that the work done by ESAL before ESAL was fired did not meet professional standards.

Although the record is filled with testimony that ESAL's design contained numerous errors and omissions, that testimony was based solely upon ESAL's unfinished working papers[1] which, according to the City's expert witnesses, were "very preliminary" plans and were, at best, thirty to fifty percent complete. In my view, the City failed to establish that ESAL's unfinished, preliminary plans were substandard; rather, the City's evidence established only that ESAL's plans would have been unacceptable had they been final plans, a point with which ESAL agrees. Given the dearth of evidence that ESAL's preliminary plans failed to meet professional standards for

3. The City's breach of contract delay claim was in substance identical to its claim in tort for delay damages for the following reasons. First, ESAL's duty was a duty of appropriate professional care imposed by law. The contract only gave rise to that duty. Under such circumstances we consider the gravamen of the claim to lie in tort. *Van Horn Lodge, Inc. v. White*, 627 P.2d 641, 643 (Alaska 1981). Second, the required standard of care would not differ under tort or contract theories. Third, the jury was not instructed as to separate standards.

4. *See Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 795 (Alaska 1981). We find that the evidentiary point raised by ESAL is without merit; its point regarding attorney's fees need not be decided since a new trial has been ordered.

1. Richard Lowman, a civil engineer, testified on behalf of the City and based his testimony solely upon ESAL's preliminary plans; he admitted that he had not analyzed the plans in detail. David Williams, an engineer, rested his testimony upon ESAL's preliminary plans. Sid Clark, the City's chief expert witness and owner of the firm that completed the design work, grounded his testimony solely on ESAL's preliminary plans and conceded that he did not know whether ESAL had considered the items that he said were deficient.

ESAL's position is that it "does not seriously dispute that these so-called 'deficiencies' in fact existed, [but] it does most vigorously dispute their characterization as such." ESAL points out that the plans upon which the City's expert witnesses' testimony was based were no more than working papers and that these papers were never intended to represent the final, complete design or to contain the final specifications for the project.

work which was less than half complete, I conclude that there is no basis for holding ESAL liable for the additional costs incurred by the City to hire a second engineering firm.

COMPTON, Justice, dissenting.

I do not agree with the court's conclusion that the trial court erred in denying ESAL's motion for a new trial. In presenting its case, the City argued that ESAL's poor engineering practice and episodic work pattern were either a breach of contract or professional malpractice, or both. A special verdict was not requested. The jury returned a general verdict awarding each party a specific amount in damages. It is unclear whether the jury determined that ESAL breached its contract with the City, negligently performed the contract, or both. We must affirm the superior court judgment if there is sufficient evidence to sustain the verdict based on either theory.

I believe the City presented sufficient expert testimony to enable the jury to infer reasonably that ESAL's performance of the contract did not meet the community standard of competent engineering practice and that its episodic work pattern and inadequate designs proximately caused the City's injury. The City's engineering expert testified that in a locality such as Seward, a small city without its own staff of engineers, a design professional[1] has a duty to act as the city's engineering staff. In other words, the design professional has a duty to protect the city's needs and interests, to come forward with recommendations for a system that will protect the city in the future, and to represent the city's interests in an unbiased manner before state and federal agencies involved in the project.

The expert testified that given the nature of the work to be performed, the project should have been completed and put out to bid in 1974. Instead, ESAL's work was only thirty to fifty percent complete when the contract was terminated in May 1974. Further, ESAL failed to use good engineering judgment and failed to represent the City's interests in an unbiased manner before government agencies when it persistently supported the use of residential water meters, a totally unacceptable and impractical solution for the City's winter water problems.[2]

The City's expert witnesses also testified that ESAL's designs, even in their incomplete stage, did not meet the standards of the community in many respects, including (1) the failure to consider street grade in the designs for water mains, (2) the failure to include profusions for the flushing of dead end lines, (3) the inadequate number and placement of fire hydrants, (4) inadequate drawings for the construction of a well and a reservoir, (5) the design of a water main network that produced an inadequate fire flow and did not meet the needs of the community, (6) the failure to address the problem of water hammer, and (7) the failure to address concerns that were set out in a 1961 study of the City's water

1. The term "design professional" is an inclusive term used to describe architects, engineers, and surveyors, who are concerned with the planning, design, and construction of structures and facilities. The practice of design engineering is akin to the practice of architecture and many of the points raised in architectural malpractice cases are applicable to malpractice claims against design engineers. *See* J. Acret, Architects and Engineers § 1.1, at 3 (1977); 19 Am. Jur.Trials, Architectural Malpractice Litigation § 1, at 238 (1971).

2. In an internal ESAL Field Inspection Report, ESAL opined in part that:

> The people of Seward and the City Council will resist any attempt at correcting the problem by metering only for they feel this is not

the base problem. We should consider more emphasis on main line correction with meters as a secondary consideration (Management Tool).... At this time the Council will not O.K. the meters so we need a more educational effort. Right or wrong the City of Seward is taking a firm stand.

> I feel we must be patient and firm up the E.P.A. and State positions before we try to push through any decision on the part of the City Council.

It is clear to me that ESAL was going to attempt to push through water meters, regardless of Seward's adamant rejection of the idea. ESAL was not representing Seward's interests in an unbiased manner. Ultimately, meters were not used.

system. ESAL's design was not simply incomplete. It was inadequate for the intended purpose.

Furthermore, the court virtually ignores the City's breach of contract claim and the comprehensive instructions given in connection therewith. Instead, it focuses on perceived inadequacies in the City's negligence claim. Failing to consider the breach of contract delay claim improperly overlooks admitted errors and omissions and reasonable inferences that a *jury* is entitled to draw therefrom.

I believe there is an evidentiary basis for the jury's verdict. We must view the evidence in the light most favorable to the nonmoving party. *Sloan v. Atlantic Richfield Co.,* 541 P.2d 717, 724 (Alaska 1975). If there is an evidentiary basis for the jury's verdict it would be an abuse of discretion for the trial court to grant a new trial based on the sufficiency of the evidence. *Ahlstrom v. Cummings,* 388 P.2d 261, 262 (Alaska 1964). Accordingly, I would affirm the superior court judgment.