Pearl LAMER, as Personal Representative for the Estate of Roger Eugene Lamer, Appellant,

v.

McKEE INDUSTRIES, INC., f/k/a McKee Door Co., and Weir Machine and Foundry Co., Inc., Appellees.

No. S–557.

Supreme Court of Alaska.

June 20, 1986.

Constance A. Cates, Paul A. Barrett, Call, Barrett & Burbank, Fairbanks, for appellant.

Marcus R. Clapp, Gregory W. Lessmeier, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee McKee Industries, Inc.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Pearl Lamer, as personal representative for the estate of Roger Lamar,[1] brought a

---

1. Due to a clerical error on his birth certificate, decedent Roger Lamar spelled his last name differently than his mother, appellant Pearl Lamer.

wrongful death action against McKee Industries, claiming strict liability in tort for the defective manufacture or design of a garage door spring "winding plug." The jury, by special verdict, found that the winding plug was not defective. Lamer appeals, claiming (among other things) that the trial court erred in not granting her motion for a new trial. We agree and hold that a new trial is necessary because the evidence supporting the jury's verdict is so slight and unconvincing as to make the verdict plainly unreasonable and unjust.

## FACTS AND PROCEEDINGS

On December 9, 1980 Roger Lamar of Overhead Door Company of Fairbanks was sent with co-worker Mike Chace to repair a garage door at the State Department of Transportation maintenance garage in Fairbanks, Alaska. While standing on an I-beam, eighteen and one-half feet above the ground, Roger attempted to make a necessary adjustment by rotating a winding plug with his winding bar. While pushing on the winding bar his hands suddenly flew up; he lost his balance and fell off the I-beam to the floor below. Roger died as a result of this fall. The complaint alleged that this fall occurred because the winding plug fractured at the hole where Roger's winding bar was inserted.

A winding plug is part of the mechanism that raises and lowers overhead garage doors. The mechanism in this case includes upper and lower shaft assemblies which, as they turn, reel in cables that lift the garage door. An electric motor, together with metal springs, supplies the force needed to spin the shaft assemblies.

The tension in each spring can be adjusted by rotating the proper winding plug. This is done by inserting a round steel bar, called a winding bar, into any one of four holes in the winding plug, loosening the set screws that secure the plug to the shaft, and pushing or pulling the bar to rotate the winding plug. If the plug needs to be turned further, a second winding bar can be inserted in the next hole and the rotation continued as necessary. Once the spring tension is correct, the set screws can then be tightened.

The winding plug and winding bar can also be used to completely release spring tension so that the shaft assembly can turn freely. This is done by inserting a winding bar into one of the four holes in the winding plug, loosening the set screws, and allowing the winding bar to rest against the wall. When this is done, the spring is said to be "barred off."

Each shaft assembly is composed of two halves connected in the center by a coupling. Each half has its own spring and winding plug. To allow the left-hand shaft to turn freely, the left-hand spring must be barred off and the center coupling loosened. Alternatively, the entire shaft can be freed if both springs are barred off.

An electric operator applies power through a chain and sprocket to the right-hand side of the lower shaft assembly. A solenoid brake prevents the operator from turning when not in use. The brake can be manually disengaged by holding down a release cord at the floor level. The locking effect of the electric operator can also be limited to the right-hand side by loosening the center coupling. If this is done, the left-hand shaft can be turned free of the resistance created by the operator and its solenoid brake.

When Roger fell from the I-beam, he was attempting to create just enough slack in the cable so that the left cable drum could be moved along the shaft to its proper place. With the left-hand winding plug secured to the shaft by its set screws, Roger inserted his winding bar into this winding plug and tried to rotate the entire shaft assembly in an attempt to slightly back-wind both springs at once. The electric operator had not been disengaged. Roger was unable to create enough slack in the cable on his first attempt. He changed

positions and tried again, but lost his balance and fell when his winding bar suddenly came out of the hole where it was inserted. A later investigation revealed that two of the four holes in the winding plug were broken.

The trial judge initially granted Lamer's motion for partial summary judgment on the issues of defect and proximate cause, but later set that order aside.[2] At trial, Lamer attempted to show that the winding plug was defective in manufacture or design. At the close of the evidence, Lamer moved for a directed verdict as to the liability of McKee Industries. The trial court denied the motion[3] and submitted all issues to the jury. The jury never reached the questions of proximate cause, comparative negligence, or damages because it found that the winding plug was not defective. Lamer moved for a new trial arguing that the jury's verdict was contrary to the weight of the evidence. The trial court denied this motion.

## THE NEW TRIAL MOTION

The issue we decide here is whether the trial court should have granted Lamer's motion for a new trial. The standard for reviewing the denial of a new trial motion is described in *Clark v. City of Seward:*

"The matter of granting or refusing a new trial rests in the sound discretion of the trial judge." If there was an evidentiary basis for the jury's decision, the denial of a new trial must be affirmed. On the other hand, where "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust," a reversal of a denial of a new trial is proper. Finally, in reviewing the denial of a motion for a new trial, we must view the evidence in the light most favorable to the non-moving party.

659 P.2d 1227, 1230 (Alaska 1983) (quoting *Bailey v. Lenord,* 625 P.2d 849, 856 (Alaska 1981)).

▮ The jury's verdict was simply that the broken winding plug was not defective. In *Caterpillar Tractor Co. v. Beck,* we held that a product is defective in design if either

(1) the plaintiff proves that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or

(2) the plaintiff proves that the product's design proximately caused injury and the defendant fails to prove, in light of the relevant factors, that on balance the benefits of the challenged design outweigh the risk of danger inherent in such design.

593 P.2d 871, 886 (Alaska 1979) (quoting *Barker v. Lull Engineering Co., Inc.,* 573 P.2d 443, 452 (Cal.1978)). The jury in the present case was properly instructed on both prongs of the *Beck* test. In her motion for new trial, Lamer argued (among other things) that because the evidence was virtually without conflict, the jury should have at least found the broken winding

---

2. Lamer argues that the trial court erred in setting aside the order for partial summary judgment. We disagree. Granting the summary judgment in the first place was inappropriate because at that stage in the proceedings genuine issues of material fact existed concerning McKee Industries' liability. Furthermore, the trial court clearly had the power and authority to correct its mistake. *Price v. S.S. Fuller, Inc.,* 639 P.2d 1003, 1008 n. 12 (Alaska 1982). *See also Stepanov v. Gavrilovich,* 594 P.2d 30, 36 (Alaska 1979). Any unfairness to Lamer created by setting aside the order was cured by the trial court's offer to grant a continuance.

3. Lamer also claims that the trial court erred in denying her motion for directed verdict as to

McKee Industries' liability. We disagree. Since reasonable people could differ in their judgment on the various theories of defect argued during Lamer's motion, the trial court properly refused to direct a verdict against McKee Industries. *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978). The situation might have been different if Lamer had argued that the winding plug was defective because it failed to live up to consumer expectations while being used in a foreseeable way. However, since she did not argue this theory in her motion, we need not address it in rejecting Lamer's claim of error concerning her motion for directed verdict.

plug to be defective under the consumer expectations prong of *Beck*. We agree.[4]

Turning to an examination of the evidence presented at trial,[5] we note again that this evidence must be viewed in the light most favorable to McKee Industries, the non-moving party. *Clark v. City of Seward*, 659 P.2d at 1230. The first question under the consumer expectations prong of *Beck* is whether the winding plug was used in an intended or reasonably foreseeable manner.

McKee Industries argues that Roger's use of the winding plug was not foreseeable because he did not "bar off" the springs, loosen the center coupling, and disengage the electric operator before applying force through his hand-held winding bar. Although these extra steps would have made the job physically easier to perform, this by no means makes it unforeseeable that an experienced garage door repairman might first take a few seconds to attempt a more physically demanding procedure in order to save valuable time. This conclusion is amply supported by the testimony of all four professional repairmen who testified at trial.

Mike Chace, who has about twelve years of experience repairing overhead garage doors, was working with Roger at the time of the accident. He testified that although the procedure Roger attempted may require more force, it nevertheless was acceptable to at least give it a try. In fact, the two men had successfully used this procedure to adjust the upper shaft assembly.

Thomas Gullickson, who is the manager of Alaska Garage Door Manufacturing and has about ten years of experience in the garage door business, testified that there was nothing improper about the procedure attempted by Roger. When asked if he was familiar with that procedure, he replied, "Yeah. We do it all the time." He explained that if he were making the repairs, he would at least attempt to make the adjustment in the same way Roger had.

Connie Seay, the owner of Alaska Garage Door Manufacturing, has been active in the overhead garage door business for more than ten years, including two years of actual experience installing and repairing garage doors. He stated that there was nothing improper about trying to back-wind both springs without first loosening the center coupling or disengaging the electric operator. He also testified that he would have done it the same way.[6]

The fourth professional repairman to testify was Lawrence Pippin. He owns Overhead Door Company of Fairbanks and has worked on thousands of garage doors during his thirty-six years in the business. He testified that there are several proper methods for making the adjustment in question, and that the method Roger selected was a proper one. Pippin also explained that he used the same procedure to remove the broken winding plug after the accident; like Roger, he neither loosened the center coupling nor disengaged the electric operator. When asked whether this procedure was abnormal in the garage door industry,

---

4. However, we find the other claims raised by Lamer concerning various evidentiary rulings and her proposed jury instructions to be without merit.

5. McKee Industries suggests that because Lamer failed to argue the consumer expectations prong of *Beck* in her motion for directed verdict, Alaska Civil Rule 50(b) precludes us from reviewing the evidence concerning the first test under *Beck*. While it is true that Civil Rule 50(b) requires a directed verdict motion as an express condition for a judgment n.o.v. motion, there is no such prerequisite for a new trial motion under Civil Rule 59. *See Clark v. City of Seward*, 659 P.2d at 1229–30. Thus, Lamer's decision not to move for a directed verdict under

the first prong of *Beck* does not prevent us from examining the relevant evidence and concluding that the trial court should have granted a new trial.

6. McKee Industries argues that in describing Roger's conduct as proper, Seay was referring to a barring off procedure that Roger never actually performed. Although Seay may have mistakenly believed that Roger intended to eventually bar off the springs instead of physically holding them with the force of his arms, this minor misunderstanding does not detract from the testimony that at the time of the accident, Roger was using a proper technique to relieve cable tension.

Pippin replied, "No, we do it all the time." An affidavit signed by Pippin was admitted during trial. This affidavit is in some ways inconsistent with his trial testimony. However, Pippin explained that he was more comfortable with the accuracy of his testimony at trial because the affidavit contained wording that was not his own.[7]

■ In sum, every experienced garage door repairman who testified at trial agreed that the procedure Roger was attempting constituted an appropriate and commonly tried method. McKee Industries did not produce any witness experienced in repairing garage doors who was able to counter this testimony. Consequently, we find that the evidence overwhelmingly supports the conclusion that Roger was using the winding plug in a reasonably foreseeable manner. McKee asserts that it did not intend or foresee this particular use of its windings plugs. However, this does not necessarily mean that the use was not reasonably foreseeable. A manufacturer must consider not only intended uses of a product but reasonably foreseeable uses as well. *Caterpillar Tractor Co. v. Beck*, 593 P.2d at 887. It is a matter of common sense that a manufacturer should not be relieved of responsibility simply because it closes its eyes to the way its products are actually used by consumers.

■ It may be helpful at this point to draw a distinction between evidence that is relevant to the issue of defect and evidence that concerns only the affirmative defense of comparative negligence. In this case an investigation at the accident site revealed that the winding plug in question contained fractures in two of its four holes, only one

of which appeared to be freshly broken. McKee Industries claims that Roger was using the previously fractured hole when he fell. Lamer hypothesizes that the jurors may have found that the winding plug was not defective because they believed that the use of a previously fractured hole was not foreseeable. To remove any possible confusion on this point, we note that Roger's *actual subjective knowledge* of a previously fractured hole is not relevant to the issue of defect, but is properly considered under McKee Industries' affirmative defense of comparative negligence. *Dura Corp. v. Harned*, 703 P.2d 396, 404–05 (Alaska 1985); *see also Prince v. Parachutes, Inc.*, 685 P.2d 83, 87–89 (Alaska 1984). In the context of determining whether a product is defective, "foreseeable use" as required under the first prong of *Beck* means the way the product was physically used, regardless of the consumer's actual subjective knowledge at the time of the accident. *Cf. Hiller v. Kawasaki Motors Corp., U.S.A.,*, 671 P.2d 369, 373 n. 2 (Alaska 1983). The fact that the consumer discovered the defect does not make it disappear. However, if the consumer knew of the defect and was aware of the danger, yet proceeded voluntarily and unreasonably to encounter this known risk, his recovery can be reduced under the doctrine of comparative negligence. *Dura*, 703 P.2d at 404–05. To say that the "foreseeable use" requirement of *Beck* is only satisfied when the plaintiff is free from comparative negligence would improperly free the defendant from the burden of establishing this affirmative defense. *Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937, 940 (Alaska 1983); *Butaud v.*

---

7. Paragraph nine of Pippin's affidavit was drafted by an attorney for McKee Industries to read: "It is not reasonably foreseeable that a qualified door repairman such as Roger Lamar would attempt to make such an adjustment without first detaching the electric operator and uncoupling the coupling holding the two halves of the lower shaft together and without the use of scaffolding." However, when confronted with this statement at trial, Pippin responded, "In that number nine, I can't quite—I can't quite recognize part of the words in there as the way I would put it...."

When asked if the wording in the affidavit was his or some lawyer's, Pippin answered, "I would say that there's not too much of my wording in this, because I have a different brogue and a different lingo that doesn't show up in this. So, it must have been wrote by someone else, and then I read it over. I'd say it's not my exact words."

When asked if he was more comfortable with his testimony at trial than with the words in the affidavit, Pippin explained: "I would say that I've had more chance to reason this thing out and explain it to the jury than I had in this short distance in a paragraph on here."

*Suburban Marine & Sporting Goods, Inc.,* 543 P.2d 209, 214 (Alaska 1975) (*Butaud I*).

■ Therefore, to satisfy the foreseeable use requirement of *Beck,* the plaintiff need only establish that the use of the product, viewed objectively, was either intended or reasonably foreseeable. Here Roger was attempting to turn the winding plug with his winding bar in an effort to perform a commonly used procedure. As already explained, this use was reasonably foreseeable. However, if on retrial McKee can meet its burden of demonstrating that Roger had an actual subjective awareness of a problem with the winding plug (such as knowledge of the previously fractured hole), *and* proceeded voluntarily and unreasonably to encounter this known risk (perhaps by using that hole), then the issue of comparative negligence can be presented to the jury and Roger's recovery, if any, can be reduced accordingly.[8]

Having concluded that Roger was using the winding plug in a reasonably foreseeable manner, we now turn to the second question under the consumer expectations prong of *Beck:* did the product perform as safely as an ordinary consumer would expect?

The parties agree that the professional garage door repairperson is the ordinary consumer of winding plugs. A safety warning label originally attached to the garage door by McKee Industries cautioned that repairs and adjustments should be performed only by qualified door service people. Thus our inquiry must focus on the evidence concerning the expectations of experts in the overhead garage door business.

Chuck McKee, the president of McKee Industries, testified that until this litigation he had never heard of a cast iron winding plug failure in the forty or so years winding plugs have been in use.

The deposition testimony of Leo Grach, a former quality assurance manager for McKee Industries, was read to the jury. Upon learning that a four and one-half inch cast iron winding plug had failed, Grach responded, "And it was a 4½ inch one that got broken? That is very surprising to me. Those things are like tanks."

Pippin testified that he has worked on doors with springs so strong that they require both hands on the winding bar. He explained that he has never had a winding plug fail, although he has bent several winding bars. He further testified that when a standard-size winding bar begins to bend, he backs off and gets an even larger bar.

Seay had never seen a cast iron winding plug fail in spite of the large forces necessarily exerted through a winding bar. He explained that he has occasionally encountered springs that can be very difficult to wind: "I've seen them to where I've had to stand on a ladder and put the bar on my shoulder, and then pull myself up the ladder in order to get enough pressure on the bar to wind the spring."

The other two experienced garage door installers, Mike Chace and Thomas Gullickson, had seen broken cast iron winding plugs before Roger's accident. Nevertheless, since both repairmen testified that the procedure Roger attempted was acceptable, it is apparent that both expect winding plugs to be strong enough to withstand any force applied during that procedure.

There is no question that winding plugs occasionally fail. In fact, a later investigation revealed two separate broken holes in the plug Roger was using, and fractures in other winding plugs at the accident site garage as well. However, this does not alter the fact that winding plug failures come as a surprise to professionals in the overhead garage door business. In sum, the weight of the evidence in this case demonstrates that an experienced garage door repairperson expects a winding plug to be able to withstand any force applied through a hand-held winding bar.

**8.** It should be emphasized that in a products liability case based on strict liability in tort, comparative negligence is limited to the plaintiff's voluntary assumption of a known risk and that the plaintiff's mere failure to exercise ordinary care is not enough to justify submitting the issue of comparative negligence to the jury. *Dura,* 703 P.2d at 405 and n. 5.

## CONCLUSION

The overwhelming weight of the evidence, viewed in the light most favorable to McKee Industries, establishes that the broken winding plug failed to perform as safely as an ordinary consumer would expect while being used in a reasonably foreseeable manner. Thus, there was an insufficient evidentiary basis for the jury to find that the winding plug was not defective under the consumer expectations prong of *Beck.* The evidence supporting the verdict is, in our view, so slight and unconvincing as to make the verdict plainly unreasonable and unjust.[9] The trial court therefore abused its discretion in denying Lamer's motion for a new trial.

REVERSED and REMANDED.

---

**9.** Because the jury found, by special verdict, that the winding plug was not defective, it never reached the questions of proximate cause, damages, and comparative negligence. Our conclusion that the verdict is without an evidentiary basis does not, by itself, establish McKee Industries' liability in this case. The issues concerning proximate cause, damages, and comparative negligence remain to be decided upon retrial. In addition, because Lamer never requested a directed verdict as to defect under the consumer expectations prong of *Beck,* we do not reach the question of whether the trial court could properly direct a verdict on that issue. One way or another, the threshold issue concerning defect must be redecided as well.