Claude KEOGH, Individually and as the Father, Natural Parent and Guardian of Brian Wright, Appellant/Cross–Appellee,

v.

W.R. GRASLE, INC., a foreign corporation doing business in Alaska; W.R. Grasle, Individually, and John Doe, Appellees/Cross–Appellants.

Nos. S–3217, S–3236.

Supreme Court of Alaska.

Aug. 30, 1991.

Richard J. Smith, Camarot, Sandberg & Smith, Anchorage, for appellant/cross-appellee.

Marcus R. Clapp and Richard L. Musick, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellees/cross-appellants.

Before RABINOWITZ, C.J., and MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

## FACTS AND PROCEEDINGS

In the late 1970s and early 1980s, the village of Ruby became interested in upgrading its electrical distribution system to alleviate voltage drop problems. In 1980, Ruby contracted with W.R. Grasle Company ("Grasle") for construction of a primary electrical distribution system. Ruby executed a letter authorizing Grasle to purchase equipment and supplies to upgrade most of Ruby's 480 volt lines to 7200 volts. One purpose of the upgrade was to permit ultimate expansion of the power system to the school and the airport.

Under their one page contract, Ruby retained Grasle to construct the primary distribution line on a time and materials basis. Ruby agreed to supply substantial materials and some support labor. In a subsequent contract, the parties further agreed that Grasle would build the additional overhead distribution lines, also on a time and material basis.

Grasle specifically designed and constructed the custom 7200 volt upgrade for Ruby's pre-existing system using a collection of off-the-shelf component parts. Grasle did not manufacture any of these components.

After construction had been completed, Claude Keogh started working for Ruby Electric under the supervision of Larry Bryant. None of the personnel of Ruby Electric had any formal training in main-

taining electrical systems, and Grasle employees did not inquire whether the Ruby personnel were qualified to work on the high-voltage system.

Tommy Meeks, Grasle's line superintendent in charge of building the Ruby line, knew there was no training program for the Ruby Electric personnel. However, Meeks believed that his company was not employed to maintain the system or to consider how the unskilled Ruby personnel would maintain it; rather, Grasle was "there to build them a line and that was it." Under the contract, Grasle did not assume responsibility for operation or maintenance of the system. In rural Alaska, village personnel commonly maintain their own electric systems. Meeks testified that he warned the Ruby personnel to turn the power off before working on the system, saying "[k]ill it before it kills you."

In 1985, Keogh was shocked and severely injured on the 7200 volt system. The accident occurred when Keogh went up a pole to visually inspect a transformer site while the line was energized. Bryant offered to turn off the power, but Keogh refused since he was only going up the pole for visual inspection and did not intend to do any work. Richard Wright, the village safety officer, accompanied Keogh and Bryant to the site. Wright also told Keogh to come down until the power was off. Keogh refused, and in the process of resetting his safety belt he hit a hot bushing on the other side of the pole. Due to the charring of tissue that occurred when the high voltage passed through Keogh's body, both of his arms had to be amputated near the shoulders. Expert testimony indicated that the extent of Keogh's injuries was directly related to the intensity of the electrical current of the 7200 volt lines.

Keogh proceeded with both negligence and product liability theories. The superior court granted summary judgment holding that the upgraded electrical system should be considered a product for purposes of strict liability. After receiving this favorable ruling, Keogh dismissed his negligence claim against Grasle, and the trial proceeded on the strict product liability claim.

At the close of the evidence, Keogh moved for directed verdicts on several issues relating to his product liability claim. The superior court denied each of Keogh's motions for directed verdict. The jury returned a unanimous verdict for Grasle on the ground that the electrical system was not defective.

Keogh appeals the superior court's denial of his motions for directed verdicts, several of the court's evidentiary rulings, and certain jury instructions. Grasle cross-appeals the superior court's ruling that the electrical system was a product for purposes of product liability law.

## I. DID THE SUPERIOR COURT ERR IN DENYING KEOGH'S DIRECTED VERDICT MOTIONS AS TO DESIGN DEFECT, EXCESSIVE PREVENTABLE DANGER, AND FAILURE TO WARN?

For purposes of resolving the issues raised in the direct appeal in this case, we assume, without deciding, that the electrical system installed by Grasle was a product for purposes of product liability law.

### (i) Design Defect.

■ At the close of the evidence, Keogh moved for a directed verdict on the issue of whether the 7200 volt design[1] of the upgrade system constituted a design defect, inasmuch as the system was to be maintained by unskilled workers. The superior court denied the motion.[2]

---

1. Whether the voltage level of the upgrade system was among its design features is not really in dispute. Donald Ruff, an electrical engineer, gave expert opinion to the effect that the choice of 7200 voltage was a design feature of the upgrade system. Grasle failed to argue that the chosen voltage was not a design feature of the system.

2. We have previously explained the proper standard of review for denial of a motion for directed verdict:

    [T]he proper role of this court, on review of motions for directed verdict ... is not to weigh conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in

In *Caterpillar Tractor Co. v. Beck*, we adopted the two alternative tests for product defect articulated by the Supreme Court of California in *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 234, 573 P.2d 443, 452 (1978). 593 P.2d 871, 886 (Alaska 1979). The *Barker* court held:

> a trial judge may properly instruct the jury that a product is defective in design (1) if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, or (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove ... that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design.

*Barker*, 573 P.2d at 457–58 (quoted in *Beck*, 593 P.2d at 884). In *Beck*, we further explained the first prong of *Barker* as follows: "Under the [first] *Barker* test, the plaintiff need only show, for strict liability to apply, that he used the product in an intended or reasonably foreseeable fashion and that the product failed to perform in that capacity as safely as expected." 593 P.2d at 885.[3]

Keogh contends that his motion for directed verdict should have been granted as to this issue because (1) Grasle admitted knowing that Ruby's untrained personnel would maintain the system, and (2) the product failed to perform as safely as expected because "their expectations were that they would be able to safely work on the high-voltage system."

Grasle argues that the evidence raised a jury question with respect to Ruby's expectations; i.e., did the personnel of Ruby Electric expect that they could safely work on the energized high voltage system. In demonstrating "room for diversity of opinion" as to this issue, Grasle cites to two transcript excerpts. First, Grasle's line superintendent in charge of building the Ruby upgrade, testified that "it was my understanding from talking to Larry Bryant, that they were not going to do any hot work. They were going to turn the system off any time they had any work to do on it." Second, Grasle points out that Meeks restated this position later. On the basis of these two transcript excerpts, Grasle contends that "Ruby's personnel could not possibly have ... expected that they could work safely on an energized high-voltage system."

In order to direct a verdict on this issue, the superior court would have to determine that the upgrade system failed to perform as safely as an ordinary consumer would expect when used in a reasonably foreseeable manner, *Beck*, 593 P.2d at 884, and that reasonable persons could not differ on this question. Thus, we must decide whether ordinary consumers of 7200 volt systems would expect to be able to climb safely on a pole supporting an energized line, and whether this activity was reasonably foreseeable to Grasle.

We conclude that Grasle's evidence, viewed in a light most favorable to Grasle, was sufficient to create a jury question as

---

the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.
This test is objective; and, if there is room for diversity of opinion among reasonable people, the question is one for the jury.
*City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 220 (Alaska 1978) (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974) (footnotes omitted)); *Dura Corp. v. Harned*, 703 P.2d 396, 402 (Alaska 1985).

**3.** We emphasized in *Beck* that "[i]n the strict liability context, the term 'defect' is 'neither self-defining nor susceptible to a single definition applicable in all contexts.'" *Beck*, 593 P.2d at 880 (quoting *Barker v. Lull Engineering Co.*, 573 P.2d 443, 453 (1978)). We further explained "[d]esign defects present the most perplexing problems in the field of strict products liability because there is no readily ascertainable external measure of defectiveness. While manufacturing flaws can be evaluated against the intended design of the product, no such objective standard exists in the design defect context." *Id.* We concluded in *Beck* that "[i]n view of the diversity of product deficiencies which could fall within the notion of defect, we are persuaded that the *Barker* two prong test provides the most comprehensive guidelines for instructing juries, without compromising any of the goals of strict liability." *Id.* at 884.

to the reasonable foreseeability of Keogh's use of the upgraded system. The superior court did not err in concluding that reasonable people could differ as to the foreseeability of Keogh's climbing the pole while the line was energized, in light of Grasle's warnings and Bryant's assurance that Ruby personnel would not work on the system while it was energized.[4]

### (ii) *Excessive Preventable Danger.*

■ Keogh also moved for a directed verdict on the issue of excessive preventable danger under the second prong of *Beck*. As noted above, this prong provides:

> a trial judge may properly instruct the jury that a product is defective in design ... (2) if the plaintiff proves that the product's design proximately caused his injury and the defendant fails to prove ... that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design.

593 P.2d at 884 (quoting *Barker*, 573 P.2d at 457–58); *see also id.* at 885. Keogh's motion for directed verdict on this issue was denied by the superior court.

Under the second prong of *Beck*, the showing on the issue of proximate causation affects the burden of proof. As we said in *Beck:*

> we also agree with the position taken by *Barker* regarding the allocation of the burden of proof:
>
> > [I]nasmuch as ... a manufacturer who seeks to escape liability for an injury proximately caused by the product's design on a risk-benefit theory should bear the burden of persuading the trier of fact that its product should not be judged defective, the defendant's burden is one affecting the burden of proof, rather than simply the burden of producing evidence. (Citations omitted.)

143 Cal.Rptr. at 237, 573 P.2d at 455. We hold that the plaintiff need only show that he was injured and that the injury was proximately caused by the product's design. The defendant may then avoid liability for a defectively designed product by proving by a preponderance of the evidence that, "on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design." *Beck*, 593 P.2d at 885;[5] *see also* W. Keeton, D. Dobbs, R. Keeton, & D. Owens, *Prosser and Keeton on Torts* 702 (5th ed. 1984).

In *Dura Corp. v. Harned*, we clarified the meaning of proximate causation stating: "[a] defendant's design defect will be the legal or proximate cause of the plaintiff's injury if the defective product was more likely than not a substantial factor in bringing about the plaintiff's injury." 703 P.2d 396, 406 (Alaska 1985). Within this framework, Keogh's motion for directed verdict under the second prong of *Beck* should be understood as consisting of two subcomponents: first, the motion sought a ruling on proximate causation (and concomitantly on whether the burden of proof on risk-benefit should be shifted to Grasle); second, the motion sought a directed verdict as to whether the design posed an excessive preventable danger.

With respect to the second subcomponent (risk-benefit analysis), our review of the record persuades us that the superior court properly denied Keogh's motion for a directed verdict. The record discloses more than sufficient facts to present a jury question. For instance, one obvious benefit of the 7200 volt system was its ready availability at the time Ruby sought an upgrade. Where reasonable minds can differ as to a risk/benefit analysis, it presents a jury question. *See Beck*, 593 P.2d at 885.

■ Concerning the proximate cause subcomponent, we conclude that Keogh

---

**4.** Our holding makes it unnecessary to address the ordinary consumer's expectations of safety under *Beck*.

**5.** We emphasized in *Beck* that a primary policy justification for shifting the burden of proof to the defendant is that "[b]esides lessening the burdens of the plaintiff's prima facie case, this allocation puts the burden of producing the relevant complex and technical evidence on the party who has the most access to and is most familiar with such evidence." *Id.* at 886 (footnote omitted).

suffered no prejudice from the superior court's denial of his motion for a directed verdict. Keogh argues that the evidence as to proximate causation was so overwhelming that no reasonable juror could fail to find that the 7200 volt aspect of the design was the proximate cause of the nature and extent of his injuries. Assuming this is true, we conclude that any error in failing to direct a verdict is harmless.

In deciding whether this alleged error was prejudicial, "we must examine the verdict in the context of all the instructions given to the jury." *Smith v. State*, 706 P.2d 1160, 1163 (Alaska 1985) (holding that erroneous failure to instruct the jury on one issue was harmless error in light of the instructions as a whole and the special verdict form). Here, the special verdict form contained two questions. First, it asked whether the product was defective. Second, it asked whether the defect proximately caused the injury. While the order of the questions perhaps should be reversed, and it should be clear that the proximate cause question applies to the *alleged* defect (since defectiveness is determined after proximate cause), viewing the instructions as a whole, we discern no prejudicial error. Jury instruction number 13 required the jury to make the proximate cause determination before determining whether the product was defective for having failed the risk/benefit analysis.[6] As the special verdict demonstrates, the jury found for Grasle because it determined that the product

was not defective. Therefore, the failure of the court to direct a verdict on the proximate cause issue is necessarily harmless error.

(iii) *Failure to Warn.*

■ Finally, Keogh asserts error in the superior court's refusal to direct a verdict for Keogh on his liability claim based on Grasle's failure to warn. The law governing failure to warn as a basis for strict product liability is well-established: " '[a] product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer fails to give adequate warning of such danger.' " *Ross Laboratories v. Thies*, 725 P.2d 1076, 1078 (Alaska 1986) (quoting *Prince v. Parachutes, Inc.*, 685 P.2d 83, 88 (Alaska 1984) (quoting California Jury Instruction § 9.007)). We agree with Grasle's argument that there was at least a jury issue with respect to this question.

Even assuming Keogh's use of the upgrade system was foreseeable to Grasle,[7] the evidence in the record is sufficient to create a jury issue regarding whether the danger posed by the upgrade system "would not be readily recognized by the ordinary user of the product" [8] and whether Grasle "fail[ed] to give adequate warning of such danger." [9] Therefore, we hold

---

6. Jury instruction number 13 states in part,

   A product is defective if, when it leaves the control of the manufacturer:
   1. Proof establishes that the product is defectively designed if ...
   ....
   b.(1) The plaintiff *first* proves that it is more likely true than not true that the product's design legally caused injury, and
   (2) The defendant then fails to prove, in light of the relevant factors, that, on balance, it is more likely true than not true that the benefits of the design outweigh the risk of danger inherent in such design.
   (Emphasis added).

7. As noted above, we are of the view that there was a jury question as to whether Keogh's climb up the pole into the energized line was foreseeable. However, for purposes of the immediate analysis, we assume that this activity was reasonably foreseeable.

8. We have recognized the "well known dangerous character of electricity." *Larman v. Kodiak Electric Ass'n*, 514 P.2d 1275, 1279 (Alaska 1973) (quoting *Polk v. City of Los Angeles*, 26 Cal.2d 519, 159 P.2d 931, 934 (1945)).

9. Keogh concedes that he was told by Meeks to shut off the system if they were going to do any "electrical work." In addition, Meeks testified that he told Larry Bryant that "[You'd] better kill it because it'll kill you." Keogh himself helped put up "Danger—High–voltage" signs on the very pole he climbed. These facts sufficiently create a jury issue on the adequacy of the warnings, especially given the well-known dangers of high-voltage electricity. As one court has stated,

   It is ... well recognized that a warning need not be given in all instances where a danger is obvious or known....

that the superior court did not err in refusing to direct a verdict in Keogh's favor on the adequacy of Grasle's warnings.

## II. ISSUES RELATING TO EVIDENTIARY RULINGS AND JURY INSTRUCTIONS.

### (i) *State of the Art Evidence.*

■ Keogh appeals the superior court's admission of Grasle's evidence of state of the art or industry custom with respect to electrical systems in Alaska. Grasle used this evidence as a basis for argument that the upgrade system sold to Ruby was not defective.[10] We will reverse an evidentiary ruling only where the error rises to the level of an abuse of discretion.[11]

■ It is well-established that state of the art or industry custom evidence is not conclusive as to liability in tort:

> [I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not justify their omission.

*The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.) (Hand, J.) (citation omitted), *cert. denied,*

*Eastern Trans. Co. v. Northern Barge Corp.*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). More specifically, conformity to the state of the art is not a defense in a product liability action. *See Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 45 (Alaska 1979), *modified on other grounds*, 615 P.2d 621 (Alaska 1980), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981), and *overruled on other grounds*, *Dura Corp.*, 703 P.2d at 405 n. 5; *Beck*, 593 P.2d at 887 ("the state of the art, or conformity with industry-wide practices will not protect a manufacturer from liability").

On the other hand, we have stated that evidence of industry custom and state of the art may be considered by the jury in a product liability case even though it may not.be treated as dispositive of the liability issue. *See Sturm, Ruger*, 594 P.2d at 45; *Beck*, 593 P.2d at 887.[12]

Keogh argues that since state of the art is not determinative of Grasle's liability, and since the feasibility of a low-voltage line is plainly not at issue here, the jury should not have been permitted to consider state of the art evidence. In response, Grasle contends that the disputed evidence was relevant to (1) the gravity of the danger under the risk/benefit analysis of *Beck*, and (2) the issue of consumer expectations under *Beck*. To be admissable, evi-

---

It is for the jury to determine whether the danger so presented is unreasonable in the absence of some warning or instruction by the manufacturer concerning safety precautions which should be taken to prevent injury. *Cantu v. John Deere Co.*, 24 Wash.App. 701, 603 P.2d 839, 842 (1979) (quoting *Haysom v. Coleman Lantern Co.*, 89 Wash.2d 474, 573 P.2d 785 (1978)).

10. Although the parties dispute whether industry custom and state of the art are distinct concepts, we find it unnecessary to resolve this question for purposes of this appeal. We conclude that the fundamental evidentiary analysis—here, an analysis of relevancy—should be identical regardless whether the evidence at issue here is considered industry custom or state of the art evidence.

11. The standard for appellate review of a trial court's decision on admissability of evidence is whether the court abused its discretion. *Alaska Northern Development, Inc. v. Alyeska Pipeline Service Co.*, 666 P.2d 33, 42 (Alaska 1983). We

will find that a trial court abused its discretion only "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Dura Corp.*, 703 P.2d at 408–09 (quoting *Peter Pan Seafoods, Inc. v. Stepanoff*, 650 P.2d 375, 378–79 (Alaska 1982)).

12. In *Beck*, we stated: "[t]he jury may consider what other manufacturers were producing insofar as it indicates feasibility." 593 P.2d at 887. In *Sturm, Ruger*, we cited *Collins v. Ridge Tool Co.*, 520 F.2d 591 (7th Cir.1975) in support of the proposition that "state of the art may be considered in determining whether a product is defective." 594 P.2d at 45. Since the discussion of such evidence in *Collins* occurred in the context of a feasibility debate, 520 F.2d at 594, our decision in *Sturm, Ruger* arguably may be read to imply no more than that state of the art evidence may be considered in relation to feasibility.

dence must be relevant and tend to establish a material proposition in the case. *Bachner v. Rich*, 554 P.2d 430, 446 (Alaska 1976). We agree with Grasle that the challenged evidence was relevant to material issues in the case. Therefore, we conclude that the superior court did not abuse its discretion in admitting the evidence.

(ii) *Evidence of Lack of Contractual Duty.*

■ Keogh argues that the superior court erred in admitting Grasle's evidence that the contracts between Grasle and Ruby are silent with respect to warnings. While tort duties are clearly distinct from any issue of contractual obligation to warn, we are not persuaded that Keogh was prejudiced by the admission of this evidence. The superior court's instruction concerning the duty to warn informed the jury that a duty to warn could exist even if there was no contractual obligation to provide information. Thus, even assuming error in the admission of the evidence, any such error was rendered harmless by the superior court's instruction on the duty to warn.

(iii) *Evidence of Ruby's Conduct.*

■ Keogh contests the superior court's decisions admitting evidence of the conduct of the City of Ruby and instructing the jury on the issue of superseding cause. In response, Grasle maintains that Ruby's conduct in failing to prevent Keogh's injury superseded the conduct of Grasle as the proximate cause of Keogh's amputation.

"The defense of superseding cause may apply in a strict products liability case." *Dura Corp.*, 703 P.2d at 402 (citing *Yukon Equipment, Inc. v. Gordon*, 660 P.2d 428 (Alaska 1983)). Not every intervening cause, however, will supersede the defendant's conduct as the proximate cause of a plaintiff's injuries. *Dura Corp.* emphasized that "[a]n intervening cause that lies within the scope of the foreseeable risk, or has a reasonable connection to it, is not a superseding cause." 703 P.2d at 402 (citing *Morris v. Farley Enterprises, Inc.*, 661 P.2d 167 (Alaska 1983); *Osborne v. Russell*, 669 P.2d 550 (Alaska 1983)).

We have stated that a superseding cause occurs only when " 'after the event and looking back from the harm to the actor's negligent conduct, it appears to the court *highly extraordinary* that it should have brought about the harm.' " *Dura Corp.*, 703 P.2d at 402 (quoting *Yukon Equipment*, 660 P.2d at 433 n. 4; Restatement (Second) of Torts § 435 (1965)) (emphasis supplied by *Dura Corp.* court). Thus, the issue presented to the superior court in determining whether to instruct the jury on superseding cause was whether Keogh's ascent of the pole while the system was energized was foreseeable or instead "highly extraordinary." The superior court ruled that "a jury question" was presented as to whether the harm was "highly extraordinary," and instructed the jury that it could determine, *inter alia*, whether "it appears highly extraordinary that the defect brought about that injury to plaintiff."

■ Given the record in this case, we conclude that the superior court did not err in submitting this issue to the jury.[13]

(iv) *Evidence and Instruction on Product Misuse.*

■ Keogh argues that the superior court erred in instructing the jury on product misuse. Keogh's position is that Gra-

---

**13.** Assuming error in the superior court's decision to instruct on the issue of superseding cause we conclude that the submission of this question to the jury was harmless error. In its Special Verdict the jury only answered one question, namely "Was the product defective, whether by design or by inadequate warning, when it left the control of the defendant W.R. Grasle, Inc. in September of 1982?" The jury answered "NO". In its superseding cause instruction the court instructed the jury in part as follows:

The defendant denies responsibility on the theory that another cause was a superseding cause which is responsible for plaintiff's injury.

*You will be required to decide this question only if you first find that the defective condition of the product legally caused plaintiff's injury.*

(Emphasis added). Thus, there is a strong likelihood that the jury in the case at bar never reached the issue of superseding cause.

sle should be estopped from arguing product misuse because Grasle failed to plead the affirmative defense of misuse in its answer. Grasle responds that product misuse is relevant to comparative negligence and foreseeability under the first prong of *Beck,* discussed *supra.*

We have ruled that comparative negligence [14] may apply in a strict product liability case. *See, e.g., Lamer v. McGee Industries, Inc.,* 721 P.2d 611, 615 (Alaska 1986); *Dura Corp.,* 703 P.2d at 403. "The defense of comparative negligence is not limited to those cases where the plaintiff uses the product with knowledge of the defective condition, but also extends to those cases where the plaintiff misuses the product and that misuse is the proximate cause of his injuries." *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 555 P.2d 42, 46 (Alaska 1976).

The superior court's instruction on comparative negligence was proper. Therefore, we conclude that Keogh's contention that the superior court erred in admitting evidence and instructing the jury on product misuse is without merit. The evidence was relevant to Grasle's defense of comparative negligence.

### (v) *Evidence of Violations of the National Electrical Safety Code.*

■ Keogh specifies as error the superior court's admission of evidence of Keogh's and the City of Ruby's purported violations of the National Electrical Safety Code (NESC). Grasle responds that evidence of NESC violations was relevant on the issue of (1) the foreseeability of Keogh's ascent, and (2) the comparative negligence analysis of the reasonableness of Keogh's encounter with the risk.

The superior court did not abuse its discretion in admitting evidence of the alleged

NESC violations. In general, evidence is admissable if relevant, and relevant if it has probative value with respect to a material proposition. Alaska R. Evid. 401; *see also Bachner,* 554 P.2d at 446. Grasle properly pled the defense of comparative negligence. This court has stated that the defense of comparative negligence "depends on proving the user's actual awareness of the product's defect and his voluntary and unreasonable encounter of the risk known to him." *Beck,* 593 P.2d at 888 (quoting *Butaud v. Suburban Marine & Sporting Goods, Inc.,* 543 P.2d 209, 211 (Alaska 1975) *(Butaud I)* and applying the standards of contributory negligence to comparative negligence) (footnote omitted). Since the reasonableness of Keogh's conduct was at issue and the NESC is clearly an objective measure of reasonable conduct with respect to electrical work,[15] evidence of Keogh's alleged violations of the NESC was, in our view, relevant to the issue of the reasonableness of Keogh's conduct.[16]

### (vi) *Jury Instruction on "Users" or "Consumers".*

■ Keogh contends that the superior court erred in refusing to instruct the jury that the employees of Ruby Electric were the exclusive users or consumers of the upgrade system. The court refused to instruct the jury in this manner because it was persuaded that to do so would be to invade the province of the jury. We review asserted error in jury instructions for abuse of discretion. *Shane v. Rhines,* 672 P.2d 895, 901 (Alaska 1983). We will not reverse if we find that asserted error in the refusal to charge was harmless. *See, e.g., Smith v. State,* 706 P.2d at 1164.

Keogh cites no case holding that determination of the class of ordinary consumers is a question of law.[17] More importantly, we

**14.** Pure comparative negligence applies in strict product liability actions in Alaska. *See Beck,* 593 P.2d at 888–89.

**15.** Keogh concedes this point.

**16.** This analysis makes unnecessary discussion of Grasle's further contention that the evidence was relevant to the foreseeability issue.

**17.** In the context of this case, where we must assume, without deciding, that an electrical distribution system is a product, it is difficult to say who is the ordinary consumer of this product. Keogh may argue that only small villages would purchase a 7200 volt system from Grasle; Grasle may argue for an expansive ordinary consumer covering all towns in the United States who need such a system. In the context

agree with Grasle that the "ordinary consumer" standard is necessarily objective. Grasle analogizes to *Prince v. Parachutes, Inc.*, 685 P.2d 83, 88 (Alaska 1984), where we stated that the ordinary user standard was an objective test for product liability cases based on a failure to warn. In *Prince*, we rejected the argument that the subjective knowledge of the actual user was relevant to the duty to warn. *Id.*

▮ The expectations of the ordinary consumer must also be an objective test. The focus in a strict product liability case is on the product, not on the conduct of the defendant. *Beck*, 593 P.2d at 883. If the defendant knew that one individual consumer could not safely use its product, that defendant may be negligent. That defendant will not be strictly liable under the first prong of *Beck*, however, unless the product fails to meet the safety expectations of the ordinary consumer. Therefore, the superior court correctly refused to instruct the jury that the class of ordinary consumers was limited to the unskilled employees of Ruby Electric.

### III. CONCLUSION.

The judgment entered below is AFFIRMED.

BURKE, J., not participating.

of this case, each side could argue its version to the jury. Similarly, Keogh could argue to the jury that the class of ordinary consumers eligible to sue in strict liability would not include "kite flyers and passerbys." On this record, we cannot say that Keogh was prejudiced by any arguments Grasle raised to this effect. *See* Alaska R.Civ.P. 61. In short, the superior court did not abuse its discretion by rejecting Keogh's proffered instruction defining the class of ordinary consumers as the employees of Ruby Electric.