**GENERAL MOTORS CORPORATION,**
Appellant,

v.

**Kimberly I. FARNSWORTH, Appellee.**

No. S–7700.

Supreme Court of Alaska.

Oct. 16, 1998.

Daniel A. Gerety and Donald C. Thomas, Delaney, Wiles, Hayes, Gerety & Ellis, Inc., Anchorage, Vincent Galvin and Mark V. Berry, Bowman & Brooke, Torrance, California, and David M. Heilbron, Leslie G. Landau, Robert A. Brundage, and Julia C. Wo, McCutchen, Doyle, Brown & Enersen, L.L.P., San Francisco, California, for Appellant.

Neil T. O'Donnell, Richard E. Vollertsen, and Anne E. Kane, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Before MATTHEWS, C.J., and COMPTON, FABE and BRYNER, JJ.

FABE, Justice.

## I. INTRODUCTION

After experiencing near fatal injuries in a car accident, Kimberly Farnsworth sued General Motors (GM) in strict liability for designing a defective seat restraint system. Following a fiveweek trial, the jury returned a verdict for Farnsworth, awarding her $2,138,973 in compensatory damages and $5,600,000 in punitive damages. The superior court denied GM's motion for a judgment notwithstanding the verdict and a new trial, and GM appeals. We conclude that the superior court erred in rejecting a comparative negligence instruction and refusing to require the jury to allocate fault to the driver who caused the accident. Because they may have affected the jury's views of GM's liability, these two errors also impugn the finding of causation and certain aspects of the damages awards. However, we find no error tainting the jury's verdict that the seat restraint system was defective or its calculation of compensatory damages. We therefore remand for a new trial limited to the issues of comparative negligence, allocation of fault, causation, and punitive damages.

## II. FACTS AND PROCEEDINGS

On the evening of February 3, 1989, Farnsworth was riding as a passenger in a 1984 GMC Jimmy truck driven by Jon Fennie. On their way back to Anchorage from dinner in Girdwood, Farnsworth and Fennie

were driving north on the Seward Highway. As they rounded a curve, Charles Walters, who was driving in the wrong lane, crashed his Honda Accord head on into Fennie's truck.

Although Fennie walked away from the accident with minor injuries, Farnsworth nearly died. She lingered in a coma for five weeks, underwent ten operations, was believed to be a candidate for a lung transplant, and had her spine reassembled using two metal rods. Among other complications, she lost the ability to walk and use her hands and had to relearn these skills through physical therapy. Three months after the accident, the hospital released her on supplemental oxygen and with a walker. Farnsworth continues to suffer from permanent restrictive lung disease and limited spinal mobility, which hamper her ability to participate in athletic activities. Due to massive internal adhesions, she also faces a high risk pregnancy if she should choose to have a child.

## A. Farnsworth's Theory of the Case

At trial, Farnsworth contended that a defect in the Jimmy's restraint system caused all of her significant injuries.[1] According to Farnsworth, the accident was a moderate, frontal collision that should not have resulted in serious injuries if her restraint system had worked properly. Her expert testified that each of the cars was moving approximately 30 m.p.h. when they collided, speeds that he said are more typical of accidents occurring

in residential areas rather than on highways. He also testified that the change in velocity (delta-v) for the Jimmy was 21–25 m.p.h. Farnsworth argued that GM's own studies showed that an individual in a properly designed seat restraint system should not suffer significant injuries even in a 32–33 m.p.h. delta-v collision.

Farnsworth claimed that the injuries she experienced resulted from "submarining" under her lap belt.[2] According to Farnsworth, "[s]ubmarining occurs when a lap belt moves up over the top of the load-bearing pelvis and into a person's abdomen. During submarining, the lap belt can cause massive abdominal injuries and fracture the spine." Farnsworth argued that she had submarined under the lap belt because GM's defective design only protected individuals the size of an average man or larger. Therefore, she claimed, Fennie, who at 175 pounds and 5'11" was slightly larger than an average sized man, walked away from the accident, whereas she, at 129 pounds and 5'3", nearly died.

Farnsworth argued that improper testing of the Jimmy had led to the belt's defective design. According to Farnsworth, GM had used only a 50th percentile male dummy in testing the Jimmy's restraint system. Farnsworth claimed that such testing was insufficient because information well known by the automotive industry establishes that submarining tendency increases as occupant size decreases. Thus, she asserted, GM's

---

1. Farnsworth presented a "crashworthiness" claim. The proposed final draft of the Restatement (Third) of Torts describes a crashworthiness claim as follows:

 Typically, the plaintiff is involved in an automobile accident caused by conduct or circumstances other than a product defect. The plaintiff would have suffered some injury as a result of the accident even in the absence of the claimed product defect. However, the plaintiff contends that the injuries were aggravated by the vehicle's failure reasonably to protect occupants in the event of an accident.
 In the early era of product design litigation, controversy arose over whether a manufacturer owed any obligation to design its product so that injuries would be reasonably minimized in the event of an accident. That controversy is now settled. Although accidents are not intended uses of products, they are generally foreseeable. A manufacturer has a duty to

design and manufacture its product so as to reasonably to reduce the foreseeable harm that may occur in an accident brought about by causes other than a product defect.
 Restatement (Third) of Torts § 16 cmt. a (Proposed Final Draft, April 1, 1997). GM does not contest Farnsworth's ability to recover under a crashworthiness theory, and we therefore take this occasion to explicitly endorse the crashworthiness doctrine as a valid theory of recovery. We note, however, that Farnsworth's claim differs from the traditional crashworthiness claim in that she alleged that the defective seat restraint system caused all, rather than part, of her significant injuries.

2. Farnsworth described her injuries as "enhanced," that is caused by the malfunction in the seat belt rather than by the severity of the collision. If Farnsworth had argued that the collision itself had caused some of her injuries, these injuries would have been non-enhanced.

tests proved only that the Jimmy would protect individuals the size of an average man or larger from submarining. Farnsworth argued that GM should have conducted sled tests[3] using the 5th percentile female dummy, which is traditionally used by the automotive industry to test the belt's safety for small occupants. If GM had conducted these tests, she contended, the defects in its seat restraint system would have been obvious.

Farnsworth's design expert testified that the Jimmy's seat restraint system failed to protect small occupants from submarining because it was defective in three ways: (i) it had an excessively shallow outer lap belt angle; (ii) the lap/shoulder belt buckle junction was too close to the seat occupant's centerline (the "CJ" length was too short); and (iii) the seat did not contain an anti-submarining ramp. As proof, Farnsworth pointed to sled tests conducted on seat restraint systems analogous to the system in Fennie's Jimmy in which the small female dummy consistently submarined. Farnsworth then introduced evidence showing that the small female dummy did not submarine during sled tests of newer Jimmy seats that incorporated the anti-submarining features suggested by her design expert.

Farnsworth asked the jury to award her compensatory as well as punitive damages. She claimed that punitive damages were appropriate in this case because, by testing the Jimmy's restraint system with only the 50th percentile male dummy, GM knowingly exposed most of the population to the risk of submarining. Farnsworth suggested that the jury calculate punitive damages by multiplying the cost of installing anti-submarining features on each Jimmy, $3.50, by the number of trucks sold in all fifty states, 1.6 million.

### B. *GM's Theory of the Case*

GM argued that Farnsworth's injuries resulted not from a defect in the seat restraint system, but from the severity of the accident and her own misuse of the belt.[4] First, GM's experts testified that the delta-v for Farnsworth was 27.9 m.p.h. rather than 24 m.p.h. as Farnsworth's expert had concluded. Second, and more importantly, GM claimed that Farnsworth had misused the belt by wearing it under her arm. GM theorized that due to this misuse, Farnsworth had "jackknifed" over the belt, which in turn had caused all of her significant injuries. GM claimed that the pattern of Farnsworth's physical injuries was more consistent with its theory of injury than with Farnsworth's.

GM further claimed that its seat restraint system was not defective. In general, GM argued that no single design can protect all occupants equally well and that a design that optimizes safety for the average sized man will decrease safety for women and children. Similarly, it argued, a design that gives slightly less protection against submarining may give slightly more protection against head injury. In particular, GM claimed that the three alleged defects identified by Farnsworth's expert were not defects at all. GM argued: (i) that the outer lap belt angle was actually steeper on Farnsworth than it would be on an average sized man; (ii) that although the "CJ" length was shorter on Farnsworth than on an average sized man, Farnsworth's design expert failed to show that the CJ length was significant in this accident; and (iii) that the seat did in fact have a 15 degree upward angle that functioned like an anti-submarining ramp.

Throughout the trial, GM also contested Farnsworth's ability to prove causation. It argued that Farnsworth's design expert failed to specify how different and "better" designs could have prevented Farnsworth's injuries in this accident.

Additionally, GM stressed that even if its seat restraint system were defective, Farns-

---

3. In a sled test, the passenger compartment is separated from the rest of the vehicle, mounted on a sled and run into a barrier at 30 miles per hour.

4. Because Farnsworth's side of the vehicle was undamaged and she did not strike anything inside the truck, the parties agreed that all of

Farnsworth's injuries were caused by the belt itself. As a result, the parties' dispute focused on why the belt had caused the injuries. Farnsworth argued that it had caused her injuries because it was defective, whereas GM claimed that the injuries stemmed from her misuse of the belt and the force of the accident.

worth's injuries were largely the fault of Fennie and Walters. GM argued that Farnsworth did not contest that Walters was under the influence of cocaine at the time of the accident and that his negligence in driving in the wrong lane was the immediate cause of the collision. In fact, GM claimed, Walters had admitted that he was drug impaired, and he was tried and convicted of criminal assault in the fourth degree for causing personal injury to Fennie and Farnsworth. GM also attributed fault to Fennie, arguing that the collision would have been less severe if he had braked more quickly. GM claimed that Fennie's own driving had been impaired by alcohol; the evidence at trial showed that he had drunk a double gin before dinner and shared two bottles of champagne with Farnsworth and another friend during dinner.

Finally, GM claimed that punitive damages were inappropriate. It argued that the crash tests it conducted on the 1984 Jimmy were the most representative and meaningful tests available. GM explained that sled tests are the usual testing tool because full car crash tests cost more and because it is unusual for a complete car to be available at the time that the seat restraint system is tested. The 1984 Jimmys, however, were fully completed when the seats were ready for evaluation. As a result, GM argued, its engineers took advantage of the unusual opportunity and conducted the full car crash tests. The engineers conducted the tests with the 50th percentile male dummy because federal standards so required. GM claimed that the tests did not show a submarining problem and that the company received no complaints after the cars were placed on the market to suggest that submarining was in fact a problem for small occupants. It argued that contrary to revealing its disregard for the safety of consumers, the fact that its engineers conducted more expensive full car crash tests proved its commitment to producing safe cars.

## C. The Verdict

The jury returned a verdict for Farnsworth, awarding her $2,138,973 in compensatory damages and $5,600,000 in punitive dam-

ages. It found that the seat restraint system was defective and that the defect was a legal cause of her injuries. Although the jury concluded that Fennie was negligent, and the superior court instructed that Walters was negligent as a matter of law, the jury found that neither Fennie nor Walters was a legal cause of Farnsworth's injuries. It then allocated 100% fault for her injuries to GM.

## III. DISCUSSION

### A. Alleged Errors in the Jury Instructions

#### 1. Standard of review

 In reviewing the superior court's rulings on jury instructions, we determine whether the challenged or refused instruction is a correct statement of the law and then decide whether any error was prejudicial. *See Loof v. Sanders,* 686 P.2d 1205, 1211 (Alaska 1984). In evaluating whether the instruction correctly stated the law, we apply our independent judgment. *See Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1019 n. 11 (Alaska 1996). If we decide that an error occurred, we evaluate whether the error was prejudicial by putting ourselves "in the position of the jurors and determin[ing] whether the error probably affected their judgment." *Vincent By Staton v. Fairbanks Mem'l Hosp.,* 862 P.2d 847, 851 (Alaska 1993). The appellant bears the burden of establishing prejudicial error. *See Myers v. Robertson,* 891 P.2d 199, 208 (Alaska 1995).

#### 2. Did the superior court err in refusing to instruct the jury on Farnsworth's comparative negligence?

GM argues that the superior court erred when it refused GM's request for a jury instruction on Farnsworth's comparative negligence. GM contends that this ruling significantly affected the verdict because its central defense theory was that Farnsworth's misuse of her belt, coupled with the force of the accident itself, caused her injuries.

Farnsworth claims that according to our prior decisions, comparative negligence is a defense in strict liability cases only where the plaintiff knowingly and unreasonably uses a defective product, *not* in cases of

product misuse. We disagree with her interpretation of the case law.[5]

### a. Comparative negligence in strict liability cases

■ The superior court rejected GM's proposed instruction because it concluded that *Dura Corp. v. Harned*, 703 P.2d 396 (Alaska 1985) permits the defense of comparative negligence only in those strict liability cases where the plaintiff knowingly uses a defective product. In *Dura*, the defendant contended that the plaintiff used a product even though he was aware that it lacked a safety device. *See Dura*, 703 P.2d at 403–04. We therefore applied a specific set of rules for deciding what kind of plaintiff negligence is relevant in a case where the alleged defect was the absence of a safety device. *See id.* at 404. We did not suggest, however, that comparative negligence was a defense to a strict liability claim only when a plaintiff knowingly used an unsafe product. In fact, we explicitly stated that the comparative negligence defense also extends to cases where the plaintiff misused the product. *See id.* at 403.[6] *Dura*'s language represents the law of this state as it was established in

*Butaud v. Suburban Marine & Sporting Goods, Inc.*, 555 P.2d 42, 46 (Alaska 1976).

In *Butaud*, the plaintiff claimed that he had been injured by a defective snow machine. *See Butaud*, 555 P.2d at 46–47. Addressing the manufacturer's claims on appeal, we ruled that comparative negligence is a defense to strict liability in tort. *See id.* at 45. Further, we stated that the defense of comparative negligence in strict liability cases is not limited to situations where "the plaintiff uses the product with knowledge of the defective condition, but *also extends to those cases where the plaintiff misuses the product and that misuse is a proximate cause of his injuries.*" *Id.* at 46 (emphasis added). *Butaud* itself concerned the second type of comparative negligence, product misuse, which GM contends occurred in this case. As a result, *Butaud* and *Dura* clearly support GM's interpretation of the law.[7]

### b. Harmless error analysis

■ Because we conclude that the superior court erred in refusing GM's proposed comparative negligence instruction, we must now examine if this error was harmless. An error is harmless "if the verdict necessarily

**5.** Farnsworth also argues that a comparative negligence instruction would have been inappropriate in this case because the jury could not have properly compared fault for conduct that she conceded would be a complete defense for GM. We address this argument in our discussion of whether the superior court's denial of the comparative negligence instruction was harmless error.

**6.** In order to support her interpretation of the case, Farnsworth quotes a portion of *Dura* stating that "failure to exercise ordinary care is not sufficient to raise a jury question on the issue of comparative negligence in a products liability case based on strict liability in tort." *Dura*, 703 P.2d at 405 n. 5. This quote, however, is inapposite. In note 5, we were overruling a previous case holding that ordinary negligence, such as dropping a gun, could be considered comparative fault. *See id.* Farnsworth's knowing misuse of the belt by wearing it under her arm would not be ordinary negligence in this sense.

Farnsworth's incorrect interpretation of *Dura* appears to stem from language in *Lamer v. McKee Indust. Inc.*, 721 P.2d 611 (Alaska 1986). Unfortunately, *Lamer* misstates *Dura*'s holding. A footnote in *Lamer* provides:

It should be emphasized that in a products liability case based on strict liability in tort,

comparative negligence is limited to the plaintiff's voluntary assumption of a known risk and that the plaintiff's mere failure to exercise ordinary care is not enough to justify submitting the issue of comparative negligence to the jury. *Id.* at 618 n. 8. However, as described above, *Dura* stated that the defense of comparative negligence applies in two types of cases: knowing product misuse where misuse is a proximate cause of injuries, or assumption of the risk by a plaintiff who is aware of the product's defect. The quote in *Lamer* leaves out the first part of *Dura*'s discussion of comparative negligence probably because *Dura* itself concerned the second type of comparative negligence.

**7.** In fact, the majority in *Butaud* refused to adopt the position that Farnsworth advocates in the present appeal and which Justice Burke defended in his dissent. *See Butaud*, 555 P.2d at 47 (Burke, J., dissenting). Moreover, our decisions subsequent to *Dura* and *Lamer* have explicitly confirmed that product misuse may be comparative negligence in strict liability cases. *See Keogh v. W.R. Grasle, Inc.*, 816 P.2d 1343, 1351 (Alaska 1991); *Koehring Manufacturing v. Earthmovers of Fairbanks*, 763 P.2d 499, 506 n. 10 (Alaska 1988).

shows that the jury would have rejected the defense contained in a requested instruction had the instruction been given." *Weston v. State,* 682 P.2d 1119, 1122 (Alaska 1984).

Farnsworth argues that the superior court's failure to give the comparative negligence instruction was harmless because of the "all or nothing" strategy that she pursued at trial. According to Farnsworth, the theory of the case that she presented to the jury was premised on the view that it should rule in her favor only if it found that she had used the belt properly. Thus, although Alaska law may not have barred Farnsworth from recovering against GM even if she had misused the belt, *see* AS 09.17.060, AS 09.17.900, Farnsworth claims that she asked the jury to find GM liable only if it concluded that no misuse had occurred. Because the jury in fact ruled in her favor, Farnsworth contends that it must have rejected GM's belt misuse theory, thus rendering harmless the failure to instruct on comparative negligence.

Farnsworth's argument, however, is premised on the assumption that the jurors clearly understood her theory of the case: that GM should be held liable only if they found that Farnsworth had used the belt properly. But we are not convinced that the jurors comprehended Farnsworth's trial strategy. First, we note that the testimony presented on this issue at trial is equivocal. Although Farnsworth and her biomechanic expert, Dr. Martha Bidez, suggested that GM should be absolved of liability if Farnsworth had worn the belt under the arm, Farnsworth's design expert, Steve Syson, testified merely that such

misuse would "degrade" the belt's performance; he did not claim that GM should be free of all responsibility if the belt had been misused.[8] Similarly, in closing argument, Farnsworth's lawyers failed to mention her "concession" that belt misuse was a complete defense for GM.

Second, and more importantly, none of the *instructions* informed the jury of Farnsworth's theory of the case. *Cf. Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1019 n. 11 (Alaska 1996) (stating that the "superior court's denial of a proposed jury instruction will be upheld if the instructions given, when read as a whole, adequately inform the jury of the relevant law") (citations omitted). In fact, Instruction 19 may have suggested to the jury that GM could be held responsible for Farnsworth's negligence.

Instruction 19 stated: "[i]n determining whether a product is used in a reasonably foreseeable manner, the focus is on what is foreseeable to manufacturers. Foreseeable uses include not only careful or intended product use, but also *product misuse* that is known or can be anticipated to occur." (Emphasis added.) Farnsworth advocated for this instruction because she claimed that "reasonably foreseeable use in this case [was] ... the use of the belt under the arm...." The superior court included the instruction based on this argument.

Absent further explanation, this instruction was inappropriate in the context of this case. Farnsworth was not alleging, nor could she have, that the belt was defective because it failed to protect her when worn under the arm. Instead, she claimed that her injuries

---

**8.** Farnsworth testified:

> Q: Is it your understanding that if you wear the seat belt under your arm improperly that that is not a proper use of the system and it's dangerous?
> A: I wouldn't expect it to save me if I wasn't wearing it properly.
> Q: And ... is it your testimony that if you wear your belt that way, that that would be improper and a misuse of the belt?
> A: Sure.

Syson testified:

> Q: From a design standpoint, wearing the belt under your arm, that would be misuse, wouldn't it?
> A: That would be my opinion, yes.

> Q: And from a design perspective, wearing the belt under your arm would degrade the protection that the system was intended to provide, wouldn't it?
> A: Based on all of the field accident data I've seen, I believe you're correct....

Dr. Bidez testified:

> Q: And if the belt was being worn under the arm, that would be an improper use of the belt, correct?
> A: Sure.
> Q: And that would be something that you would not fault General Motors in that instance, would you?
> A: That's correct. I would not be sitting here if Ms. Farnsworth had had that belt under her arm. She did not.

were caused by submarining. Product misuse entered this case only as a defense for GM. Instruction 19 failed to make this clear to the jurors and instead may have suggested to them that GM could be held fully liable for Farnsworth's injuries even if she had worn the belt under her arm.[9]

■ Reviewing the events at trial and the instructions as a whole, we reject Farnsworth's claim that the jury's verdict necessarily shows that it rejected GM's belt misuse theory. Instead, we conclude that GM has carried its burden of showing that the error of denying the comparative negligence instruction probably affected the jurors' judgment. The instructions provided no opportunity for the jury to allocate fault to Farnsworth if it concluded that she had worn the belt under the arm. As a result, we conclude that the issue of Farnsworth's comparative negligence must be submitted to the jury on remand.[10]

3. *Did the superior court err in refusing to instruct that Walters caused Farnsworth's injuries as a matter of law?*

■ GM argues that the superior court erred in refusing to instruct the jury that Walters caused Farnsworth's injuries as a matter of law. We agree.

Walters was tried and convicted of criminal assault in the fourth degree for "causing personal injury" to Fennie and Farnsworth. No one disputed that Walters's negligence in fact caused the accident. Analogizing to other areas of tort law, GM argues that the original tortfeasor is always considered a legal cause of a plaintiff's further injuries unless there is a superseding cause. Because Farnsworth did not allege that the defects in the restraint system were a superseding cause, GM claims that the only question that should have been posed to the jury was the proportion of Walters's fault.

GM's position is consistent with related tort principles. An original tortfeasor is considered a proximate cause, as a matter of law, of injuries caused by subsequent negligent medical treatment. *See* Restatement (Second) of Torts, § 457 (1965) ("If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner."). Just as

9. On appeal, Farnsworth argues that this instruction was appropriate because GM presented evidence that she may have been seated in numerous positions that degraded the performance of the restraint system. Farnsworth claims that the instruction explained to the jury that such positioning was foreseeable to the manufacturer and should not have rendered the restraint system ineffective. However, Farnsworth suggested this argument in the trial court only briefly and at the end of the parties' lengthy discussion of Instruction 19. GM is correct that Farnsworth's initial and primary reason for offering the instruction was to explain to the jury that wearing the belt under the arm was foreseeable to GM. Furthermore, even if the instruction would have been appropriate to the extent that it helped jurors analyze GM's arguments regarding Farnsworth's seating position, it would still have been incorrect to give the instruction without explaining that the phrase "misuse" did not refer to GM's belt under the arm theory.

We therefore agree with GM that the superior court erred in giving this instruction. Although the instruction correctly stated that product misuse can sometimes be a foreseeable use, *cf. Hiller v. Kawasaki Motors Corp.*, 671 P.2d 369, 373 (Alaska 1983), the instruction was misleading in the context of this case.

We do not believe, however, that Instruction 19 could have suggested to the jury that the belt was defective *because* it failed to protect Farnsworth when worn under the arm. All the defect evidence at trial centered on the issue of submarining. At no point during trial did Farnsworth argue that the belt was defective because it failed to protect her when misused. In fact, Judge Shortell specifically forbade Farnsworth from making such an argument. Given these facts, we conclude that this instruction does not impugn the jury's findings on defect.

10. GM also argues that the superior court erred in refusing to give the passenger's duty of care instruction, which would have permitted the jury to find Farnsworth negligent in relying on Fennie as a driver. Even if the superior court erred in refusing this instruction, the error was harmless. Because the jury found that Fennie's conduct was not a legal cause of Farnsworth's injuries, it also implicitly concluded that her alleged negligence in relying upon him was not a legal cause of those injuries. We find no error tainting the jury's decision that Fennie's conduct was not a legal cause of Farnsworth's injuries; therefore, the issue of her alleged negligence in relying upon his driving need not be tried upon remand.

the injury caused by the original tortfeasor exposes the injured individual to the potential negligence of doctors, so did Walters's negligence in causing the accident expose Farnsworth to the potential defects in the seat restraint system.

Farnsworth suggests that Walters should not be considered a legal cause of injuries caused by her seat belt because a seat belt's sole purpose is to protect someone after a collision occurs. However, a doctor, like a seat belt, is necessary only *because* something goes wrong. Phrasing the issue in terms of foreseeability, it is just as foreseeable to an original tortfeasor that equipment in a car may malfunction as it is that a doctor may act negligently in treating the plaintiff's injuries.

Holding Walters liable as a matter of law for Farnsworth's enhanced injuries also furthers one of the policy goals of tort law. Tort law seeks to deter future behavior that exposes others to injury. In this case, Walters drove while he was under the influence of cocaine. His actions caused the collision that exposed Farnsworth to the defect in her seat restraint system. Allowing a jury to return a verdict allocating no fault to Walters for her injuries frustrates the purpose of deterring Walters and others from driving while they are under the influence of drugs.

Finally, ruling that Walters caused Farnsworth's enhanced injuries as a matter of law does not significantly reduce the jury's role in the complicated factual determination of allocation of fault. Adopting GM's position only slightly reduces the jury's field of choice: instead of allocating fault to Walters from 0% to 100%, the jury would have had to allocate some fault to Walters. As a result, we conclude that the superior court erred in refusing to instruct the jury that Walters caused Farnsworth's injuries as a matter of law. The court should give GM's requested instruction on remand.

**4.** *Did the superior court err in instructing the jury on apportionment of damages?*

 Instruction 24 provided that if the jury found that a defect in the seat restraint system was a substantial factor in causing Farnsworth's enhanced injuries, GM could be held liable for all of her injuries unless GM proved that they could be apportioned between enhanced and non-enhanced injuries. GM claims that Instruction 24 did not belong in the case, and that even if it did, it placed the burden of apportionment on the wrong party.[11]

 An apportionment of damages instruction is appropriate only when the plaintiff is alleging that a single harm, such as paraplegia, was caused both by the defect and the severity of the crash itself. *See, e.g., Mitchell v. Volkswagenwerk, AG,* 669 F.2d 1199, 1201 (8th Cir.1982). In such cases, the instruction informs the jury that once the plaintiff proves that the defendant's defective design was a substantial factor in causing the injury, the defendant must be held jointly and severally liable for the entire harm. *See id.* at 1201–02. The instruction is based on the reasoning that it is impossible to divide a single harm: a plaintiff cannot be expected to prove what portion of an injury like paraplegia was caused by the defect and what portion was caused by the collision. *See id.* at 1203 n. 2. The apportionment instruction therefore permits the jury to hold the car manufacturer liable for all of the plaintiff's damages even though the car manufacturer is theoretically responsible only for damages caused by the defect.

 It is true that in this case neither Farnsworth nor GM contended that some of Farnsworth's injuries were caused by the defect and some were not; this fact suggests that apportionment was not at issue in this case. *See Czarnecki v. Volkswagen of America,* 172 Ariz. 408, 837 P.2d 1143, 1148 (Ariz. App.1991) (stating, in a crashworthiness case, that an apportionment instruction would not

---

**11.** An apportionment instruction does not affect the issue of allocation of fault. A jury which holds a defendant liable for all of the plaintiff's damages under an apportionment instruction is still free to allocate fault to other wrongdoers from whom the car manufacturer could seek contribution. *See Mitchell,* 669 F.2d at 1203. In this case, Instruction 25 told the jury how to allocate fault to responsible parties.

be proper where both sides had pursued an all or nothing strategy). But when Judge Shortell offered to eliminate the apportionment instruction if GM stipulated that the injuries were *not* apportionable, GM declined. In these circumstances, it was reasonable for Judge Shortell to include the instruction in order to provide guidance to the jury in case it decided to reject the parties' all or nothing approach.

■ Having concluded that the superior court did not err in including Instruction 24, we now turn to the question of whether the instruction accurately stated the law of apportionment. GM argues that the instruction should have placed the burden of apportioning injuries on Farnsworth, and Farnsworth claims that the instruction correctly placed the burden on the defendant, GM. The issue of who has the burden to apportion injuries in a crashworthiness case is hotly contested. *See* Restatement (Third) of Torts, *supra*, § 16 cmt. d (describing the debate in the cases and law reviews); *see also* Note, *Apportionment of Damages in the "Second Collision" Case,* 63 Va. L.Rev. 475 (1977) (advocating Farnsworth's position); Levenstam & Lapp, *Plaintiff's Burden of Proving Enhanced Injury in Crashworthiness Cases: A Clash Worthy of Analysis,* 38 De Paul L.Rev. 55 (1989) (advocating GM's position). The rule advocated by Farnsworth is the majority position, dubbed the *Fox–Mitchell* approach. *See Mitchell v. Volkswagenwerk, AG,* 669 F.2d 1199 (8th Cir.1982). It is also the position supported by the drafters of the third Restatement of Torts. *See* Restatement (Third) of Torts, *supra,* § 16. The minority position, advocated by GM, is referred to as the *Huddell* approach, named after *Huddell v. Levin,* 537 F.2d 726 (3rd Cir.1976).[12]

Adopting the reasoning of the *Huddell* court, GM contends that the plaintiff must bear the burden of apportioning injury because a crashworthiness claim rests on the idea that a defect enhanced the plaintiff's injuries. *See Huddell,* 537 F.2d at 738.

Thus, according to GM, a plaintiff who fails to show what injuries he or she would have sustained absent the defect has failed to show enhancement and therefore failed to establish a crashworthiness claim.

Relying on the *Fox–Mitchell* approach, Farnsworth responds that the burden of apportionment belongs to the defendant. In *Mitchell,* the court reasoned that the same rules should apply to a crashworthiness claim as apply to claims of harm caused by multiple tortfeasors: once a plaintiff proves that the tortious conduct of two or more defendants has combined to bring about harm to the plaintiff, the burden is placed on the defendants to limit their liability by apportioning the injury. *See Mitchell,* 669 F.2d at 1206 (citing Restatement (Second) of Torts, *supra,* § 433B).

Farnsworth also argues that three policy reasons justify placing the burden of apportionment on the defendant. First, it would be unjust to allow a proven wrongdoer to escape liability when the harm cannot be apportioned. Second, the manufacturer is in the best position to perform such apportionment given its extensive knowledge of the product and its technical resources. Third, a contrary rule would allow a manufacturer to escape liability even when a plaintiff had shown that the manufacturer had sold a defective product.

Using the concept of "enhanced" injury as the framework for a crashworthiness case does lead one to the conclusion that a plaintiff who fails to show what injuries he or she would have suffered absent the defect has failed to show enhancement at all. However, it is just as reasonable to use the concept of multiple tortfeasors as the framework for an indivisible injury claim. Once this framework is adopted, the rules of section 433B of the Restatement of Torts are triggered and the burden of apportioning injury falls on the defendant. Alaska has explicitly adopted the Restatement's rules for apportioning injury in multiple tortfeasor cases. *See State v. Abbott,* 498 P.2d 712, 728 (Alaska 1972); *see also* Restatement (Third) of Torts, *supra,*

**12.** Of the 16 state courts that have spoken on the issue, 13 support Farnsworth's position and 3 support GM's. *See* Restatement (Third) of Torts, *supra,* § 16 cmt. d. The three state courts that have adopted GM's position are New York, Michigan and New Mexico. *Id.*

§ 16 cmt. d (stating that the majority of courts that have addressed the issue as well as the drafters of the Restatement find the analogy to section 433B compelling).

Although both the *Fox–Mitchell* approach and the *Huddell* approach are logically defensible, we find the majority rule more compelling for policy reasons. We agree with Farnsworth that it should be the proven wrongdoer who must bear the burden of limiting its liability; it would be unfair to require a plaintiff who has already proved that a defect was a substantial factor in causing his or her injuries to try another case based upon what *might* have happened absent the defect. Thus, we conclude that Instruction 24 accurately stated the law of apportionment by placing the burden of apportioning injury on the defendant. The superior court committed no error with respect to this instruction.[13]

5. *Did the superior court err in instructing the jury that it could find defect under the consumer expectation test?*

GM next argues that the superior court erred in permitting the jury to find the restraint system defective under the consumer expectation test. We reject GM's argument.

■ In *Caterpillar Tractor Co. v. Beck,* 593 P.2d 871 (Alaska 1979), we adopted a two-prong test for finding defect in design cases. Under this test, the factfinder can find a product defective either

if the plaintiff demonstrates that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner [consumer expectation test] . . . or if the plaintiff proves that the product's design proximately caused his injury and

the defendant fails to prove . . . that on balance the benefits of the challenged design outweighed the risk of danger inherent in such design [risk benefit test].

*Id.* at 884 (citing *Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443, 457–58 (Cal.1978)).

GM argues that the consumer expectation test does not make sense in a complex design case like this one and urges that it should be abandoned for three reasons. First, it contends that consumers may have unreasonable or uninformed expectations. Second, GM claims that the test is standardless and thus leads to haphazard verdicts. Third, it argues that the test is particularly out of place in complex design cases because consumers have no basis for forming expectations about how products like cars should perform in serious accidents. GM buttresses its position by pointing out that the proposed new Restatement of Torts and the majority of states do not allow recovery under the consumer expectation test without also requiring that the product's risks outweigh its benefits.

■ Farnsworth responds that the consumer expectation test is well established in Alaska's product liability law and has been applied in numerous cases since it was adopted by this court in *Beck.*[14] She also contends that even if the test were inappropriate in certain situations, this case does not present one of those situations because seat belts are familiar products about which consumers can form reasonable expectations. In addition, Farnsworth challenges GM's interpretation of the case law and insists that only a minority of states reject the consumer expectation test as an alternative to the risk benefit test.[15]

---

**13.** GM also argues that the superior court's error in giving the apportionment instruction was compounded by its refusal to give GM's supplemental causation instruction. Because we conclude that the superior court did not err in giving the instruction, we do not address this third argument.

**14.** Farnsworth also argues that GM waived the right to challenge the use of the consumer expectation test because it failed to request separate findings on the two defect tests. In making this argument, Farnsworth relies on the law of states

other than Alaska. Under Alaska law a new trial must be held where proper and improper theories were submitted to the jury and it was asked to render a general verdict unless it appears that the prevailing party was entitled to the verdict on other grounds as a matter of law. *See Matomco Oil Co. v. Arctic Mechanical, Inc.,* 796 P.2d 1336, 1343 (Alaska 1990).

**15.** Which states do and do not allow recovery under the consumer expectation test is intensely debated by scholars. *See* Marshall S. Shapo, *In Search of the Law of Products Liability: The ALI*

■ We agree with the California Supreme Court that consumers can form reasonable and educated expectations about how certain products should perform. *See Soule v. General Motors Corp.*, 8 Cal.4th 548, 34 Cal.Rptr.2d 607, 882 P.2d 298, 310 (Cal.1994) (stating "we cannot accept GM's insinuation that ordinary consumers lack any legitimate expectations about the minimum safety of the products they use. In particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers.").[16] When a seat belt, designed to be an instrument of protection, becomes an instrument of life-threatening injury, a consumer is justified in concluding that it did not perform as safely as promised. A seat belt is a familiar product whose basic function is well understood by the general population.

In addition, our initial reasons for adopting the consumer expectation test are sound. In *Beck*, we adopted the test as part of Alaska's product liability law partly because it "incorporates notions of the implied warranty of fitness for reasonable use, a primary concept in the evolution of strict products liabili-

ty...." *Beck*, 593 P.2d at 885. The "implied warranty of fitness or merchantability requires that goods 'be fit for the ordinary purposes for which the goods are used.'" *Id.* at 885 n. 49 (quoting AS 45.05.096(b)(3), renumbered as AS 45.02.314(3)).

In this case, a jury that believed Farnsworth's version of the facts could intelligently conclude that the Jimmy's restraint system was unfit for ordinary use. According to Farnsworth, she and Fennie were wearing their seat belts normally in a typical frontal collision of moderate severity. Fennie was protected by his seat belt and walked away from the accident with minor injuries. In contrast, Farnsworth submarined under her lap belt and lingered near death in a coma for five weeks. The parties did not contest that the seat belt itself caused her injuries. Given these facts, there is no reason why a jury would be "haphazard" in deciding that Farnsworth's seat restraint system was unfit for ordinary use because it failed to protect smaller occupants from submarining. The superior court did not err in permitting the jury to find the restraint system defective under the consumer expectation test.

*Restatement Project*, 48 Vand. L.Rev. 631, 666 (1995) (stating that the cases repeatedly cited by the reporters leave considerable room for interpretation and explaining that the author's independent review of 14 of these cases revealed that only one to three provided strong support for the proposition that American courts predominantly rely on the risk benefit test as opposed to the consumer expectation test); *see also* John F. Vargo, *The Emperor's New Clothes: The American Law Institute Adorns a "New Cloth" for Section 402A Products Liability Design Defects—A Survey of the States Reveals a Different Weave*, 26 U. Mem. L.Rev. 493, 556–57, 951–53 (1996) (conducting a state survey and concluding that 19 jurisdictions "apply an ordinary consumer expectation test to design defect cases as an exclusive or independent and alternative measure of strict liability design defects").

16. GM is incorrect in asserting that the *Soule* court abandoned the consumer expectation test in all crashworthiness cases. Instead, *Soule* held that the consumer expectation test is appropriate only if consumers' everyday experience with the product allows them to form conclusions about its minimum safety features. *See Soule*, 34 Cal. Rptr.2d 607, 882 P.2d at 308. The California Supreme Court made no sweeping generalizations about which products would satisfy the above requirement. In addition, *Soule* affirmed

the place of the consumer expectation test in California product liability law, stating "[w]ithin these [above] limits, the test remains a workable means of determining the existence of design defect. We therefore find no compelling reason to overrule the consumer expectations prong of *Barker* at this late date, and we decline to do so." *Id.* at 310.

*Soule* did recognize, however, that some products may be so unfamiliar to the average consumer that it would be difficult to form any intelligent expectations about how they should perform. The issue in *Soule* was whether a wheel and a wheel bracket were defective because they collapsed rearward and inward during an accident. *See Soule*, 34 Cal.Rptr.2d 607, 882 P.2d at 301. According to the plaintiff, the collapse of the wheel caused the area beneath the pedals to crumple which in turn fractured her ankles. *Id.* The court ruled that the consumer expectation test was not a proper method of determining defect under those facts because "[a]n ordinary consumer of automobiles cannot reasonably expect that a car's frame, suspension or interior will be designed to remain intact in any and all accidents." *Id.* 34 Cal.Rptr.2d 607, 882 P.2d at 310. We do not address in this case whether, as the *Soule* court suggested, the consumer expectation test is inappropriate under certain facts.

B. *Other Alleged Errors*

1. *Did Farnsworth present sufficient evidence to support the jury's finding of causation?*

GM argues that there was insufficient evidence to support a finding that defects in the restraint system caused Farnsworth's injuries. Although we believe that the record would support a finding of causation, we do not fully address GM's argument because we conclude that the failure to give a comparative negligence instruction requires retrial of the causation issue.

"Where two issues are interwoven and not reasonably divisible ... a new trial on both issues is required." *Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 795 (Alaska 1981). In this case, the issue of comparative negligence was closely tied to the issue of causation. GM argued not only that Farnsworth had been negligent in misusing the seat belt but also that her negligence caused her injuries; according to GM's theory of the case, Farnsworth was injured because her belt misuse caused her to "jackknife" over the belt. As we concluded above, however, the jury instructions provided no opportunity to attribute fault to Farnsworth for her alleged negligence. In fact, Instruction 19 may have suggested to the jury that GM could be held responsible for any belt misuse and thus may also have suggested that GM could be held accountable for injuries *caused* by this misuse. We therefore conclude that the superior court's error in failing to give a comparative negligence instruction taints the finding of causation. The parties should retry this issue on remand.

2. *Challenges to the punitive damages award*

GM challenges the punitive damages award on four grounds: (i) that its compliance with applicable federal regulations precluded punitive damages as a matter of law; (ii) that there was insufficient evidence to support a finding of punitive damages; (iii) that the award was excessive; and (iv) that the award was extraterritorial and thus unconstitutional under *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

Addressing other claims raised by this appeal, we concluded above that the superior court erred in rejecting an instruction on Farnsworth's comparative negligence and in refusing to require the jury to allocate fault to Walters. Because these erroneous rulings may have increased GM's culpability in the jury's eyes by diminishing the culpability of other potential wrongdoers, we vacate the punitive damages award. We therefore need not address GM's arguments on excessiveness, sufficiency of the evidence or extraterritoriality [17] because the jury may award a different amount of punitive damages or no punitive damages on remand. We also do not address GM's argument regarding its compliance with relevant federal regulations. Because GM raised this point for the first time on appeal,[18] the superior court never had the opportunity to address it and thus there is no decision for us to review. *See Nenana City School Dist. v. Coghill*, 898 P.2d 929, 934 (Alaska 1995).

## IV. *CONCLUSION*

We REMAND for a new trial limited to the issues of causation, punitive damages,

---

17. Furthermore, GM waived the extraterritoriality argument. Unlike BMW in *Gore*, GM did not file a motion in limine to exclude evidence of extraterritorial sales. *See* Gore Supreme Court Oral Argument, 1995 WL 605988 p. 4. Neither did GM object to Farnsworth's closing argument, where the extraterritorial sales were discussed. Instead, GM raised the extraterritoriality argument for the first time in its motion for a new trial and remittitur. On remand, however, if the jury chooses to award punitive damages, the superior court should assure that the award comports with the principles established by the Supreme Court in *Gore*.

18. There was no substantive discussion of how compliance related to punitive damages in pretrial argument. In its motion for judgment notwithstanding the verdict, GM argued for the first time that compliance with federal standards should limit a punitive damages award. However, GM did not claim that compliance prohibited a punitive damages award as *a matter of law*. Instead, it discussed the issue as one objective factor that the superior court could rely upon in deciding whether the punitive damages award was excessive.

Farnsworth's comparative negligence, and allocation of fault to Walters and Farnsworth. Because no error tainted the jury's finding that GM's seat restraint system was defective or its compensatory damage calculation of $2,138,973, these aspects of the verdict should stand on remand.

REVERSED in part, AFFIRMED in part, and REMANDED.

EASTAUGH, J., not participating.