**INTERIOR REGIONAL HOUSING AUTHORITY, Appellant and Cross–Appellee,**

v.

**Denise G. JAMES, as Personal Representative of the Estate of Chance C. Carlo, and as Mother and Next Friend of Raven Carlo, a minor, and personally for herself, Appellees and Cross–Appellants.**

Nos. S–8493, S–8563.

Supreme Court of Alaska.

Oct. 8, 1999.

Tracey L. Knutson, Sisson & Knutson, P.C., Anchorage, for Appellant and Cross-Appellee.

Michael A. Stepovich and Allen F. Vacura, Fairbanks, for Appellees and Cross-Appellants.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

FABE, Justice.

### I. INTRODUCTION

In 1988 Denise James moved into a home in Fort Yukon under a home ownership opportunity program. Seven years later, she lost the home in a fire that killed her son Chance and injured James and her daughter Raven. James sued Interior Regional Housing Authority (IRHA), the coordinator of the home ownership project, for negligence and wrongful death. IRHA defended on the ground that the home ownership agreement signed by James placed the duty of maintenance on James. The trial court concluded that the Landlord Tenant Act governed this case and imposed the duty of maintenance on IRHA as a landlord.

IRHA appeals the court's determination that this case falls under the Landlord Tenant Act. James cross-appeals, maintaining that the court erred in refusing to allow her to present the alternative theory that IRHA voluntarily assumed the duty of maintenance. Although we conclude that the Landlord Tenant Act does not apply to this case, we remand for a new trial on whether IRHA may have voluntarily assumed a duty of maintenance and repair.

### II. FACTS AND PROCEEDINGS

The Interior Regional Housing Authority provides housing services to at least forty-three Alaska Native tribes and thirty villages in the Interior region. In May 1985 IRHA, with supplemental funding from the Department of Housing and Urban Development (HUD), contracted to construct a mutual help home ownership project in Fort Yukon: Design Lab, Inc. served as the architect; KHO Construction, Inc. was the primary contractor for the homes; and KHO subcontracted with Tundra Mechanical, Inc. for installation of the heating systems.

Upon the Fort Yukon housing project's completion in October 1988, Denise James signed a Mutual Help and Occupancy Agreement (MHO agreement) with IRHA and moved into a home in the project. The agreement provides that "[IRHA] will give the Homebuyer an opportunity to achieve

ownership of a Home in the Project in return for fulfilling [her] obligations to make a contribution to the development of the Project, to make monthly payments based on income, and to provide all maintenance of the Home." Section 3.2 of the agreement further explains that "[t]he term of the Homebuyer's lease ... shall expire when the Initial Purchase Price has been fully amortized in accordance with the Homebuyer's Purchase Price Schedule ... unless this Agreement is previously terminated or the Homebuyer previously acquires ownership of the Home." The agreement provided that IRHA would credit any amount of James's monthly payment that exceeded the administrative charge to an equity payments account. Although the MHO agreement assigned James the responsibility for the maintenance of her home, the agreement also obligated IRHA to inspect the home at least every three months during the contractor's warranty period.

Soon after the Fort Yukon homes were completed, many occupants complained to IRHA about difficulties with the heating system. In particular, the occupants complained that a significant amount of cold air was coming into the homes. HUD, IRHA, Design Lab, KHO, and Tundra Mechanical all collaborated on how to solve the problem. IRHA then had the furnaces modified and repaired in accordance with the Uniform Mechanical Code. IRHA performed annual inspections of all Fort Yukon homes until at least July 1994. In response to several complaints from James about her furnace in the fall of 1994, IRHA arranged for additional furnace repairs and charged James for its costs.

In February 1995 a fire broke out in James's home. James's son, Chance, was killed in the fire, and James and her daughter, Raven, received severe burns.

James, individually, as representative of Chance's estate, and as guardian of Raven, sued IRHA, KHO Construction, Design Lab,

and Tundra Mechanical for negligence and wrongful death.[1] James contended in her complaint that "the heating system was inadequate to safely heat the premises, the furnace and furnace room did not meet building codes and [were] otherwise inadequately vented, and the design and construction of the house did not allow for a safe escape from the fire." She further alleged that IRHA breached its duty to provide safe and habitable premises under the Landlord Tenant Act and Alaska's common law.

IRHA moved for summary judgment, claiming that the MHO agreement placed the duty of maintenance and repair on James. James also moved for partial summary judgment, asserting that the Uniform Residential Landlord Tenant Act imposed that duty on IRHA. The trial court denied IRHA's motion for summary judgment and granted James's motion, ordering that "for the reasons set forth orally on the record 9/26/97 the [MHO agreement] provisions as applied to this case will be treated as a lease agreement subject to the provisions of the Uniform Landlord Tenant Act, A.S. 34.03.010 et seq."

The jury found that both IRHA and James were negligent and that both were legal causes of the plaintiffs' damages; it apportioned eighty percent of the fault to IRHA and twenty percent of the fault to James. IRHA appeals the trial court's ruling that the Landlord Tenant Act governs this case. James cross-appeals, maintaining that the court should have allowed James to argue alternatively at trial that IRHA voluntarily assumed the duty of repairing the furnace.

### III. DISCUSSION

#### A. The Trial Court Erred in Ruling that IRHA Has a Duty of Maintenance under the Landlord Tenant Act.

The trial court agreed with James that the court should treat the MHO agreement as a lease subject to the Uniform Residential Landlord Tenant Act[2] (Landlord Tenant Act).[3] IRHA maintains that the fed-

---

1. KHO Construction and Design Lab were defunct entities when James filed suit and did not participate in the litigation process. Although Tundra Mechanical litigated at the trial level, it is not involved in this appeal because the jury found that it was not negligent.

2. See AS 34.03.010 et seq.

3. We review de novo an order granting summary judgment. See Jackinsky v. Jackinsky, 894 P.2d 650, 654 (Alaska 1995).

erally mandated MHO agreement determines the relationship between James and IRHA and places responsibility for maintenance of her Fort Yukon home, including its furnace and smoke detectors, on James.

As part of the Indian Housing Act,[4] Congress established a mutual help home ownership opportunity program "designed to meet the homeownership needs of Indian families on Indian reservations and other Indian areas."[5] Under the home ownership program, the Secretary of Interior through HUD could enter into contracts with Indian housing authorities to provide financial assistance for the development and operation of single-family home projects.[6] To receive federal financial assistance, the Indian housing authority needed to require that each selected family enter into a mutual help and occupancy agreement.[7] Under federal law that agreement had to require that "[t]he family shall be responsible for the maintenance and monthly utility expenses of the dwelling."[8] The Act also required that housing authorities develop a procedure to "ensur[e] the timely periodic maintenance of the dwelling by the family"[9] and provide "an opportunity [for the family] to purchase the dwelling under a lease-purchase, mortgage, or loan agreement."[10] Alaska Statute 18.55.998 also authorizes supplemental housing development grants if the housing authority has obtained approval for a federal loan or grant through HUD.[11]

■ Despite the many federal and state regulations governing the mutual help home ownership program, none explicitly addresses the legal relationship between the housing authority and the homebuyer once they have contracted under the mutual help and occupancy agreement. In order to decide whether IRHA retains a duty of maintenance under the agreement and can be liable for the Jameses' injuries, we must determine whether the agreement places the homebuyer in a lease or an installment land contract.[12] The Landlord Tenant Act covers a lease and requires that IRHA, as landlord, bear the duty of maintenance. On the other hand, an installment land contract gives the homebuyer equitable title and responsibility for maintenance of her own home.

James maintains that the MHO agreement is predominantly a lease or lease with option to purchase rather than an installment sale contract because she never acquired any equity in the home. Although we have never addressed specifically the legal relationship that exists between the housing authority and a homebuyer under an MHO agreement, we have examined the implications of an MHO agreement in the context of a forcible entry and detainer action. In *Kopanuk v. AVCP Regional Housing Authority*,[13] the homebuyer "asserted that the contract was not a lease with an option to purchase, but rather an installment contract for sale of real property."[14]

While recognizing that the agreement described itself as a lease,[15] this court characterized it as a "hybrid contract"[16] that included provisions typical of both a lease with option to purchase contract[17] and an install-

---

**4.** Former 42 U.S.C. §§ 1437aa *et seq.* (1994) (repealed 1996). Although Congress has repealed the home ownership portion of the Indian Housing Act, it has enacted a similar Native American Housing Assistance and Self–Determination Act, 25 U.S.C. § 4101 *et seq.* But because this action accrued under the former statute, we analyze this issue using the former version.

**5.** *Id.* § 1437bb(a).

**6.** *See id.* § 1437bb(b)(1) & (c)(1).

**7.** *See id.* § 1437bb(e).

**8.** *Id.* § 1437bb(e)(3).

**9.** *Id.*

**10.** *Id.* § 1437bb(e)(4).

**11.** *See* AS 18.55.998(b).

**12.** This court applies its independent judgment when reviewing interpretation of a contractual agreement. *See Kopanuk v. AVCP Reg'l Hous. Auth.*, 902 P.2d 813, 816 (Alaska 1995).

**13.** 902 P.2d 813 (Alaska 1995).

**14.** *Id.* at 815.

**15.** *See id.*

**16.** *Id.* at 817.

**17.** To support its claim that the MHO agreement was a lease/option contract, the housing authority in *Kopanuk* relied on several provisions of the

ment contract.[18] We concluded that the housing authority could not maintain a forcible entry and detainer action against the homebuyer because the agreement created equitable interests in the homebuyer under state law: [19]

> [W]e need not determine the exact label to be applied to the contract, as we conclude that the contract creates equitable interests, or potential equitable interests, in the homebuyer.... One of the justifications for [forcible entry and detainer] actions is the lack of equity held by the tenant-in-possession.... Equity may exist in fact since the "homebuyer" has put up land for a "down payment." Furthermore, a person who maintains property over a period of years may have equity in the appreciated value of that property.[20]

Thus, our decision in *Kopanuk* determines that a court should treat a homebuyer under the mutual help occupancy program as a homeowner with equitable title.

Here, the trial court acknowledged our analysis in *Kopanuk* but found that the Landlord Tenant Act could apply to specific provisions of the agreement that resembled a lease. Reasoning that the maintenance provisions were more characteristic of those found in a lease than in an installment contract, the court found that the Landlord Tenant Act controlled these provisions of the agreement. Since AS 34.03.040 [21] prevents a landlord or tenant from waiving the rights and remedies under the Landlord Tenant Act, the trial court concluded that the MHO agreement provisions assigning responsibility for maintenance to James were unenforceable [22] and therefore that the duty of maintenance remained with IRHA.

■■■ But as IRHA argues, federal law preempts any attempt to interpret the maintenance provisions of the MHO agreement under the Landlord Tenant Act. Federal law preempts state law if Congress expressly or implicitly declares the state law preempted or "if the state law conflicts with the federal law to the extent that (a) it is impossible to comply simultaneously with both or (b) the state regulation obstructs the execution of the purpose of the federal regulation." [23] In determining whether state law is preempted,

agreement, including provisions that listed homebuyer obligations similar to those under the Landlord Tenant Act, such as terms that allowed the housing authority to change the variable monthly payments at its discretion, required counseling and inspection, mandated income reports, restricted who may reside in the home, disallowed subletting or assignment, controlled insurance, and detailed termination procedures. *See id.* at 817.

**18.** The homebuyer in *Kopanuk* cited several contractual provisions to bolster his claim that the MHO agreement was an installment contract, including provisions that used the word "homebuyer" throughout the agreement, required a non-refundable contribution of land, established equity accounts for holding excess payments, required no additional payment to exercise the purchase option if exercised after 25 years, granted the tenant the ability to purchase the home before the price dropped to zero, and stated that the homebuyer "must purchase" the home if certain conditions are met. *See id.* at 816–17.

**19.** *Id.* at 817 & n. 4.

**20.** *Id.* at 817. Our analysis here is in accordance with that of several tribal courts that have prohibited forcible entry and detainer actions against MHO agreement-protected homebuyers. *See, e.g., Cole v. Kaw Hous. Auth.,* 4 Okla. Trib.

362, 383–84 (Kaw D.Ct.1995); *Sac and Fox Hous. Auth. v. McKosato,* 2 Okla. Trib. 316, 326–28 (Sac & Fox 1991). One tribal court specifically held that "during the term of the MHO Agreement, the Homebuyer holds the premises for all practical purposes in equitable ownership." *McKosato,* 2 Okla. Trib. at 327.

**21.** AS 34.03.040(a) prohibits certain provisions in a rental agreement:

> (a) A rental agreement may not provide that the tenant or landlord
> (1) agrees to waive or to forego rights or remedies under this chapter;
> (2) authorizes a person to confess judgment on a claim arising out of the rental agreement;
> (3) agrees to the exculpation or limitation of any liability of the landlord or tenant arising under the law or to indemnify the landlord or tenant for that liability or the costs connected with it;
> (4) agrees ·to pay the landlord's attorney fees.

**22.** *See* AS 34.03.040(b) ("A provision prohibited by (a) or (c) of this section included in a rental agreement is unenforceable.").

**23.** *In re J.R.B.,* 715 P.2d 1170, 1172 (Alaska 1986).

we look to the "policy, intent, and context of the federal statute." [24]

In enacting the Indian Housing Act, Congress explicitly required that any housing authorities seeking financial assistance include a provision in the MHO agreement that places responsibility for the maintenance of the dwelling on the family.[25] Federal regulations expressly provide that "[t]he homebuyer shall be responsible for all routine and nonroutine maintenance of the home, including all repairs and replacements." [26] Thus, the Indian Housing Act and its imposition of the duty of maintenance on the homebuyer directly conflicts with the Landlord Tenant Act's imposition of that duty on the landlord. Accordingly, the Landlord Tenant Act cannot control this aspect of the mutual help and occupancy agreement because federal law preempts it, and the trial court erred in ruling that the Landlord Tenant Act imposed a duty of maintenance on IRHA, rather than on James, the homebuyer.

B. *The Trial Court Erred in Refusing to Allow James to Present the Alternative Theory that IRHA Assumed a Duty of Maintenance.*

■ James argues on cross-appeal that the trial court erred in refusing to allow her to present at trial the alternative theory that IRHA voluntarily assumed the duty of repairing the furnace. Because of its ruling that the Landlord Tenant Act applied to IRHA, the trial court decided that the issue was moot and did not allow James to pursue this argument at trial. But given our conclusion that the trial court erred in finding IRHA had a duty of maintenance under the Landlord Tenant Act, we must consider James's alternative theory that IRHA voluntarily assumed a duty to repair and maintain the furnace.

As James notes, we held in *Adams v. State* [27] that "the state [can] assume[ ] a common law duty by its affirmative conduct." [28] In *Adams,* state fire officials inspected a hotel for fire risks and discovered conditions that created an "extreme life hazard." [29] The state officials never provided further guidance to the hotel in remedying the problems, and eight months later several guests were either killed or injured in a fire at the hotel.[30] In response to the state's contention that it did not owe a duty of care to the injured plaintiffs, this court held that "once an inspection has been undertaken the state has a further duty to exercise reasonable care in conducting fire safety inspections, and that liability will attach where there is a negligent failure to discover fire hazards which would be brought to light by an inspection conducted with ordinary care." [31]

Similarly, in *Smith v. State* [32] we concluded that the state not only assumed a duty to repair a water pump but may have also assumed a duty to remedy a larger fluoride problem in the town of Hooper Bay's water supply. In *Smith,* the state planned to replace water system equipment in order to decrease excessive fluoride levels in a municipal water system. As a first step, the state repaired a fluoride pump at a township wellhouse.[33] A few weeks after replacement of the pump but before the beginning of the rehabilitation project, a resident died from fluoride poisoning.[34] The state conceded that

---

24. *Webster v. Bechtel, Inc.,* 621 P.2d 890, 897 (Alaska 1980) (internal quotation marks omitted).

25. *See* former 42 U.S.C. § 1437bb(e)(3) (1994) (repealed 1996).

26. Former 24 C.F.R. § 950.428(d)(1) (1998). Congress removed this regulation from the C.F.R. effective April 13, 1998. *See* Implementation of the Native American Housing Assistance and Self–Determination Act of 1996, 63 Fed.Reg. 12,349 (1998).

27. 555 P.2d 235 (Alaska 1976).

28. *Id.* at 240.

29. *See id.* (internal quotation marks omitted).

30. *See id.* at 238–39.

31. *Id.* at 240. The legislature has since removed the possibility of liability presented in such a situation. *See* AS 09.65.070(d)(1); *Wilson v. Municipality of Anchorage,* 669 P.2d 569 (Alaska 1983).

32. 921 P.2d 632 (Alaska 1996).

33. *See id.* at 633.

34. *See id.* at 633–34.

it assumed a duty to use reasonable care in repairing the pump but disputed that it assumed a broader duty to remedy the fluoride problem.[35] Even though the township was responsible for the system, we concluded that, by voluntarily taking action on it, the state may have assumed certain duties to individuals who rely on the water system:

> The repair of the pump may have been a complete undertaking in and of itself, or it may have been the initiation of a broader undertaking to resolve the fluoride problem....
>
> ... A reasonable person could infer, from the evidence in the record, that the State had undertaken to resolve the fluoride problem, thereby assuming a duty towards [the plaintiff] and other Hooper Bay water users to complete this undertaking in a non-negligent manner.[36]

Here, IRHA may have assumed not only a narrow duty to repair James's furnace but also a broader duty to discover and remedy any future problems with it. When it received complaints about serious defects in the heating systems of the Fort Yukon homes upon their completion in 1988, IRHA arranged and paid for all necessary modifications to the heating systems. While the extent of its duty may have only been to use reasonable care in repairing the furnace, IRHA may have voluntarily broadened its duty by engaging in ongoing maintenance and repair. Not only did IRHA inspect all Fort Yukon homes at least every three months during the contractor's warranty periods and annually thereafter until at least June 1994, but it also served as James's contact person and arranged for the repair of many, if not all, of her maintenance problems from the beginning of her contract. Thus, IRHA may have voluntarily assumed a duty to inspect for hazardous problems with the furnace and may be liable for negligent failure to discover and remedy such conditions. Accordingly, we reverse and remand for trial on this issue.[37]

## IV. CONCLUSION

■ Because the MHO agreement assigns the duty of maintenance to James, we REVERSE the trial court's ruling that the Landlord Tenant Act imposed a duty of maintenance on IRHA. But because we conclude that the trial court erred in refusing to allow James to pursue her voluntary assumption of duty argument, we REMAND for a new trial.[38]

---

**35.** *See id.* at 634.

**36.** *See id.* at 635.

**37.** IRHA appeals several of the trial court's evidentiary rulings and its determination of when prejudgment interest began to accrue. Because we vacate the judgment, we need not reach these issues.

James argues on cross-appeal that the trial court erred in reducing Chance's and Raven's damage awards by James's fault. While we need not reach this issue, we note our recent decision in *Fancyboy v. Alaska Village Electric Cooperative, Inc.*, 984 P.2d 1128 (Alaska 1999). In *Fancyboy*, we held that even if a non-negligent co-plaintiff bears no fault, AS 09.17.080 only permits the court to enter judgment against a defendant for its equitable share of the obligation and thus a negligent co-plaintiff's fault can effectively reduce a non-negligent co-plaintiff's recovery. *See id.* at 1133.

**38.** We note that the trial court may not need to relitigate the compensatory damages in this case. In *General Motors Corp. v. Farnsworth*, 965 P.2d 1209 (Alaska 1998), we concluded that even when some aspects of a case must be relitigated, the compensatory damage aspect of the verdict should stand on remand because the trial court error did not taint that aspect. *See id.* at 1222–23. While the court and the parties here proceeded under an improper liability theory, James presented testimony of an economist who calculated the amount of loss to the estate, and IRHA did not offer an alternative amount. Thus, it is up to the trial court to determine if the presentation of new evidence at trial in support of the theory of voluntary assumption of duty will affect the amount of the compensatory damage award. The question of "[w]hat issues are to be relitigated upon remand, in the absence of a directive from this court, is within the discretion of the trial court." *Caterpillar Tractor Co. v. Beck*, 624 P.2d 790, 795 (Alaska 1981).